Victor Manuel **VASQUEZ,** and Brenda Suarez Vasquez, individually and on behalf of the Estate of Alyssa Amber Vasquez, Appellants,

v.

**HYUNDAI MOTOR COMPANY and Hyundai Motor America, Inc.,** Appellees.

No. 04–01–00554–CV.

Court of Appeals of Texas, San Antonio.

Aug. 29, 2003.

Michael A. Caddell, Cynthia B. Chapman, James M. Juranek, Caddell & Chapman, L.L.P., Houston, Ezequiel Reyna, Jr., Law Offices of Ezequiel Reyna, Jr., Weslaco, Les J. Strieber, III, Ricardo G. Cedillo, Davis, Cedillo & Mendoza, Inc., San Antonio, for appellants.

Brendan K. McBride, David M. Prichard, Kevin M. Young, Prichard Hawkins Davis & Young, L.L.P., Leslie G. Landau, Bingham McCutchen, L.L.P., Ryan G. Anderson, Ball & Weed, P.C., Thomas H. Crofts, Jr., Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, Thomas N. Vanderford, Jr., Hyundai Motor America, Fountain Valley, for appellees.

Sitting en banc: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J.

SPEEDLIN, Justice.[1]

## ON MOTION FOR RECONSIDERATION EN BANC

Opinion by PAUL W. GREEN, Justice.

Victor and Brenda Vasquez's motion for reconsideration *en banc* has been granted and the panel opinion and judgment issued August 21, 2002 have been withdrawn. The matter has been resubmitted to the entire court and the following is substituted.

\* \* \*

This is a jury selection case. The issue is whether plaintiffs in a products liability case should be allowed to ask prospective jurors whether they are biased against non-users of seat belts when the defense claims the decedent's failure to wear a seat belt contributed to her death from a deploying air bag. The objection is that the seat belt questions would unfairly screen the jury pool by pre-testing juror attitudes about certain evidence in advance of hearing the evidence. We hold that questions concerning juror bias against non-users of seat belts should be allowed where evidence of seat belt non-use is relevant to the issues in the case. Accordingly, the judgment is reversed and the matter is remanded for a new trial.

### Background

Appellants Victor and Brenda Vasquez sued Hyundai Motor Company and Hyundai Motor America, Inc. in a crashworthiness case after their four-year old daughter, Amber, was killed when the passenger-side air bag of a 1997 Hyundai Accent deployed in a low-impact collision. The Vasquezes claim the Hyundai air bag system was defectively designed because it deployed with too much force. Amber was not wearing a seat belt at the time of the collision and consequently, Hyundai says, she was too close to the air bag when it deployed, causing her death.

The jury found no design defect and the court rendered judgment against the Vasquezes. The Vasquezes contend the verdict was the product of a jury strongly biased against non-users of seat belts and that they were prevented from identifying the biased jurors. The trial court only allowed the Vasquezes to question the venire panel about personal seat belt habits; they were not allowed to ask if any jurors could not be fair to the Vasquezes if they knew Amber had not been wearing a seat belt.

### The Voir Dire

■ When the case came for trial, two separate venire panels were drawn and dismissed before a jury was finally seated from a third panel. Questioning revealed that a significant percentage of prospective jurors were unalterably biased against non-users of seat belts, and it was for that reason the first two panels were dismissed. The existence of this apparently widespread bias led the court and the parties into a running dialogue over how best to deal with the seat belt issue in voir dire since Amber's failure to wear a seat belt would become obvious as the evidence was developed.[2] The Vasquezes, quite under-

---

1. Not participating.

2. Ordinarily, the use or nonuse of a safety belt is not admissible evidence in a civil trial. *See* TEX. TRANSP. CODE ANN. § 545.413(g) (Vernon 1994). In fact, the Vasquezes complain on appeal that the trial court erred in allowing evidence that Amber was not wearing a seat belt at the time of the accident. Because of our holding, *infra*, it is unnecessary to decide that issue. However, we note that in this case the Vasquezes are attacking the design of a passive restraint system that Hyundai says includes the seat belt as a component. These

standably, wanted to identify those venire members who held a strong bias against non-users of seat belts and determine whether they could be fair in spite of their bias. Hyundai claims the questions the Vasquezes wanted to ask were improperly case specific and sought to commit the jurors as to the weight they would give certain evidence. The trial court finally decided the Vasquezes could ask general questions about the prospective jurors' personal seat belt habits, but they would not be allowed to tell the venire panel Amber had not been wearing a seat belt nor could they question the panel on the extent of their bias toward non-users of seat belts.

To assist in understanding the issue, some of the relevant record is reproduced below. We begin with the voir dire of the first panel of prospective jurors. As noted, the problem of extensive bias against non-users of seat belts began to emerge during examination of this panel when counsel for the Vasquezes asked this question:

> MR. CEDILLO (for the plaintiffs): Now, what I specifically am looking for are those among you right now that will say, if [Amber] wasn't wearing a seat belt, then I don't care what the scientific evidence is. I don't care about the characteristics of this particular air bag and how it operated in this particular accident at this particular speed. As long as I know that she wasn't wearing an air bag—I mean a seat belt, that means that, you know, there's no way Hyundai can be responsible. If that is an attitude that you have about seat belts and about air bags, if that is an attitude that you have about accidents of this kind and the tragic results that flow from them, that's what I'm asking you about. Is there anyone here that regardless of what the evidence is, once you hear [Amber] wasn't wearing a seat belt your mind is made up?

Twenty-nine out of the forty-eight venire members responded that their minds were made up. After Hyundai attempted to rehabilitate the panel, fourteen venire members continued to maintain they could not be fair and impartial knowing Amber had not been wearing a seat belt. At that point, the court granted the Vasquezes' request to disqualify the entire panel.

issues appear to have very little to do with what the legislature almost certainly intended by enacting the statute. The purpose of the statute was to codify a judicially created rule of evidence that prohibited defendants from attempting to use plaintiff's seat belt nonuse in "primary collision" automobile accident cases as a means of mitigating the defendant's liability for damages. The statute was never intended to exclude evidence of seat belt usage in "secondary collision" cases where that evidence might be relevant to material issues in the case. For example, in a product liability case alleging defective seat belts, the supreme court said the legislature did not intend for the statute to shield the product defendant from liability by preventing the plaintiff from proving he had been wearing the allegedly defective seat belt at the time of injury, the effect of which would defeat the causation element of the plaintiff's claim. *See Bridge-*stone/Firestone v. Glyn-Jones, 878 S.W.2d 132, 134 (Tex.1994). Similarly, this case is not about damages caused by the primary collision between the vehicle in which Amber was a passenger and another vehicle; rather, it is a suit for damages caused by the secondary collision that occurred when the air bag deployed and struck Amber. Hyundai claims the seat belts are an essential design component of a passenger restraint system that includes the air bags. If that is so, the purpose of offering evidence that Amber was not wearing a seat belt when the air bag deployed would not be to mitigate the product defendant's liability for damages, but would be offered instead to support Hyundai's defense that the air bag, in conjunction with seat belt use, was not defective as designed. In short, we do not believe the legislature intended for the seat belt statute to apply in a case like this one.

The court then drew a second venire panel. After providing general instructions, the court questioned the panel on the seat belt issue:

> THE COURT: Remember, I said you also had to decide this case based on all the evidence that you are going to hear in this case. Not parts of the evidence or part facts, but every case has certain facts. This case, for example, I anticipate the facts that you will hear in this case is that Amber was in that car and she was not wearing a seat belt. Here's the question I have. Remember, once you are in that jury box, you are going to swear to me and you are going to promise to me that you are going to wait to hear all of the evidence that comes in and you are going to follow the law that I give you before you return your verdict. Is there anyone sitting there among you that believes that one fact alone, that Amber was not wearing her seat belt, that one fact alone would prevent you from following your oath and that you would not decide this case on all of the evidence? If you believe you could not wait and listen to all of the evidence before you decide this case, please raise your hand. Based on that one fact alone.

In response to the court's question, nineteen of the fifty-two panel members raised their hands indicating they could not be fair. Once again, the entire panel was dismissed.

The next day, the court conferred with the parties about how to deal with the seat belt bias problem and some alternatives were suggested. Hyundai agreed to the idea of the trial court asking the panel general questions and, depending on the responses, asking specific follow up questions to individual jurors. But the Vasquezes wanted the trial court to conduct voir dire as it had with the second panel. The court responded:

> THE COURT: The problem with that is I was automatically excluding some people who may have understood my questions—either of the questions on seat belt or on the sympathy—merely trying to be persuading them to set aside the idea that they might be giving weight or not being allowed to give weight to evidence, and that was not the purpose of my question. That's why—I'm not suggesting you are not correct that we attempt, in part, to do that, but I think further exploration has to be done.

The Vasquezes continued to object, arguing the trial court should not change strategies:

> MR. CEDILLO: [I]f we look at the transcript of what the Court did yesterday, the Court advised the panel members that the Court would be giving instructions to follow the evidence, to consider all of the evidence, to follow the Court's instructions, and only then did the Court ask specifically would you be able to do that knowing in this case, for example, this was a child—the death of a four-and-a-half-year-old child. "Would you be able to do that in this case knowing that the child wasn't wearing a seat belt?"

The Vasquezes' complaints were unavailing.

The court then drew a third venire panel. During the Vasquezes' general voir dire of the panel, they asked for a bench conference to clarify what they would be allowed to ask of the panel regarding seat belts.

> MR. CEDILLO: Okay. Your Honor, in an abundance of caution, having been instructed, I sought this bench conference to ask the Court whether or not I could ask attitude questions

about belting, seat belting, and seat belting habits, much akin to what I did the last time I did general voir dire.

It is my understanding that the Court has instructed me not to ask the question about the child being not belted, and I think I know how to make that distinction, although for the record I do object that the Court instructed me not to go into that area of inquiry. . . .

It is my understanding that I want to ask them questions—What I want to do is ask them general questions about their general attitudes about belting such as—

THE COURT: Their own personal habits.

MR. CEDILLO: Their own personal habits such as "How many of you belt before you start the car?"

THE COURT: Right.

MR. CEDILLO: "How many of you have ever gone through the process of belting before you get to the first major intersection? How many of you think your trip doesn't really start until, you know, until you have left the driveway?" Things like that.

THE COURT: I'm going to let you ask those questions. Response to that, Mr. Young?

MR. YOUNG (for Hyundai): Yes. Thank you. First of all, Hyundai objects to any of these seat belt questions, general or not, for the same reasons that we articulated . . . on the record last week. But as we sit right now, they have already talked about the fact that there's a child fatality in a car crash and that she was in the front seat. And if we really sit here and think that the jurors are not going to put all of that together and we are not going to end up in the same

situation that we did last week, I cannot see how that is even possible.

. . .

MR. YOUNG: But I think at this point, Judge, to let him ask any of those general questions is wrong. We are going to taint this jury again. We are going to get people knocked off the jury who don't need to be knocked off.

Following more discussion, the trial court stated: "I'm going to let you ask general questions about belting. Not about children, but about their attitudes about putting seat belts on themselves."

The Vasquezes then proceeded to ask general questions about the panel's personal seat belt habits, including the following:

MR. CEDILLO: Just your personal habits. . . . How many of you are always buckling up before the car moves? . . . How many of you buckle that seat belt before the car is out of the garage? . . . How many of you are completely buckled before you exit the driveway? . . . How many of you are already buckled in before the car leaves the parking spot . . . ?

In response to these questions, forty-six out of the seventy-two venire members raised their hands.

At the end of the general voir dire and before proceeding with individual questions, the Vasquezes asked for another conference:

MR. CEDILLO: I just want to make sure that I'm following the Court's instructions. I need to inquire into [the jury's] individual attitudes regarding the non-use of the seat belt. My understanding was that although I was not permitted to make the general inquiry that I would be allowed to ask it individually.

THE COURT: What is the type of question you need to ask other than what has already been asked about their own individual use of seat belts or not seat belts?

MR. CEDILLO: Your Honor, I need to know whether or not they would be predisposed regardless of the evidence to—Their preconceived notion is that if there is no seat belt in use, no matter what else the evidence is, that they could not be fair and impartial.

. . .

MR. YOUNG: The Court has allowed—even over our concerns—allowed questions about the potential jurors' personal use, their habits, or their inclination about seat belts. Ricardo [Cedillo] has already talked about the fact that there was a little girl and she was killed and she was in the front seat.

You cannot now let him go further and all of us pretend that we are going to ask these people in a vacuum their predispositions about seat belt usage. You are asking them to let Mr. Cedillo pretest these jurors about the facts of this case which is something that none of us foresaw last week, but that's what happened on those two panels. We let them be pretested which, by case law, is clearly disallowed.

You have the discretion, Your Honor, to not allow any further questioning on this issue. That's how it ought to be done. They have enough information to make judgments about seat belt usage and the juror information. If you go further . . . then you are disqualifying people that don't need to be disqualified, and that is a violation of our right to a jury of peers here in Bexar County.

THE COURT: All right. I'm going to sustain the objection. We are not going to go any further into seat belts.

. . .

MR. CEDILLO: Your Honor, I object to your preventing me from fully exploring the jurors' attitude. I am not making it case specific.

. . .

And I am entitled to fully explore whether or not I can get an unbiased juror and your ruling is not letting me do that.

### Standard of Review

A voir dire ruling will not be disturbed absent a clear abuse of discretion. *Babcock v. Northwest Mem. Hosp.,* 767 S.W.2d 705, 709 (Tex.1989). To establish an abuse of discretion, it must be shown that, under the facts and circumstances of the case, the law permits only one decision. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). In other words, we may not find an abuse of discretion merely because we would have decided the issue differently than the trial court. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

### Discussion

"In Texas, the right to a fair and impartial trial is guaranteed by the Constitution and by statute." *Babcock,* 767 S.W.2d at 708; *see* Tex. Const. art. I, § 15; Tex. Gov't Code Ann. § 62.105 (Vernon 1998). Consequently, "[a] broad latitude should be allowed to a litigant during voir dire examination. This will enable the litigant to discover any bias or prejudice by the potential jurors so that peremptory challenges may be intelligently exercised." *Babcock,* 767 S.W.2d at 709. "[A] court abuses its discretion when its denial of the

right to ask a proper [voir dire] question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges." *Id.*

It became obvious during the extended voir dire process that a high percentage of potential jurors held strong views on seat belt usage. When the first two venire panels were told Amber had not been wearing a seat belt when the accident occurred, as many as one-third to one-half of the potential jurors indicated their minds were made up before hearing any evidence. Quite clearly, potential jurors expressing that strength of bias are disqualified from jury service. However, the Vasquezes claim they were denied the opportunity to discover whether any potential jurors on the third and final panel, including those who rendered the verdict in this case, held a similar unredeemable bias.

■■■ The right to voir dire examination of potential jurors is not unlimited, and the scope of the voir dire phase of trial is largely a matter within the sound discretion of the trial judge. *See id.* at 709. The purpose of voir dire, of course, is to ensure a fair and impartial jury; it is not a means to seek unfair advantage. For that reason, an attempt to commit a potential juror to a particular outcome or as to what weight the juror would give certain evidence is improper. *See Lassiter v. Bouche,* 41 S.W.2d 88, 90 (Tex.Civ.App.-Dallas 1931, writ ref'd) (cannot ask questions that seek to commit jurors, in advance of evidence, as to weight they would give certain evidence).

Hyundai claims the questions asked of the first two venire panels, and that the Vasquezes sought to ask of the third panel, were improper commitment questions that served only to "pre-test" the panel for their answers before hearing any evidence. We disagree.

■■■ The impropriety of a commitment question is found in its design to determine a potential juror's view of certain evidence; it does not seek to expose the existence of bias. And although the existence of bias will axiomatically always influence a juror's view of the case, the converse is not true. That is, a potential juror's view of the case as influenced by certain evidence does not necessarily mean the juror is biased and cannot be fair. Indeed, every trial lawyer hopes jurors are influenced by the evidence; otherwise, what is the point of a jury trial? But a party is not permitted to "pre-test" juror views on the weight they would give certain evidence for the purpose of exercising peremptory challenges.

In short, the voir dire process is about seating a fair and impartial jury. And we see a clear distinction between questions that seek to determine the existence of unfair bias and those that seek instead to determine how potential jurors will treat certain evidence. This distinction is borne out by the cases, which admittedly are few.

In *Airline Motor Coaches v. Bennett,* 184 S.W.2d 524 (Tex.Civ.App.-Beaumont 1944), *rev'd on other grounds,* 144 Tex. 36, 187 S.W.2d 982 (1945), the venire panel was asked, "Would the mere presence of a quart of rum and a piece of a bottle of rum or liquor in our car prejudice you at all in this case?" This question was permitted because it focused on whether the jurors could be fair knowing there was liquor in the car, and did not "require the juror to state what he would do with certain evidence which would be offered in the case nor to state what his verdict thereon would be." *Id.* at 528.

Also, in *City Transp. Co. v. Sisson,* 365 S.W.2d 216 (Tex.Civ.App.-Dallas 1963, no writ), the venire panel was asked whether

any of them would be biased against the plaintiff "if during the trial evidence of her use of narcotics in prior years or of any narcotic convictions in the past should be introduced." *Id.* at 219. Again, this question was permitted because it focused on the ability of the jurors to be fair, and did not ask the jurors how they would weigh that evidence in reaching their verdict.

In contrast to these cases, courts have rejected voir dire questions whose intent appears not to discover bias, but instead to determine how jurors would respond to certain evidence. For example, in *Campbell v. Campbell,* 215 S.W. 134 (Tex.Civ. App.-Dallas 1919, writ ref'd), the court affirmed the trial court which rejected the question: "Would the fact that the testator, in making his will, left out and did not mention and did not give anything to one or more members of his family, influence you in finding a verdict in this case?" *Id.* at 136–37. And in *Parker v. Schrimsher,* 172 S.W. 165 (Tex.Civ.App.-Amarillo 1914, writ ref'd), the court rejected the question: "Would you let the fact that Schrimsher executed the mortgage or mortgages to the bank influence you in determining whether or not the property in controversy was a homestead of himself and family at the time he executed the mortgage?" *Id.* at 170. The questions in *Campbell* and *Parker* plainly did not seek to determine whether the jurors could be fair, but instead improperly sought to determine what the jurors' verdict would be based on certain evidence.

The Vasquezes specifically wanted to ask potential jurors "whether or not they would be predisposed regardless of the evidence to—Their preconceived notion is that if there is no seat belt in use, no matter what else the evidence is, that they could not be fair and impartial." This question clearly focuses on the ability of the jurors to be fair. All the other seat belt questions permitted by the trial court—those that asked about the jurors' personal seat belt habits—may have provided some useful information to the parties, but none of them directly addressed what had manifestly become the crucial question: whether any potential jurors were biased against non-users of seat belts.

The Vasquezes were entitled to determine which of the potential jurors could not be fair to them based solely on the fact that Amber was not wearing a seat belt when she was killed and they were prevented from doing this. The trial court's decision to disallow questions directed at exposing this bias was an abuse of discretion that denied the Vasquezes the right to trial by a fair and impartial jury. *See Babcock,* 767 S.W.2d at 709. The issue is sustained.

## Conclusion

Because of our holding, it is not necessary to address the remaining issues on appeal. The trial court's judgment is reversed and the case is remanded for a new trial.