OPINION
 

 J. HARVEY HUDSON, Justice.
 

 Grey Wolf Drilling Company, L.P., appeals the trial court’s judgment in favor of Denfer Boutte on his premises liability claim for damages sustained as a result of a fall while working on the rig. We affirm.
 

 Anschutz Exploration Corporation operated the Benton Trust # 1 Well in Fort Bend County, Texas. Grey Wolf and An-schutz entered into a drilling contract under which Grey Wolf would perform the drilling work on the well. Anschutz also hired Halliburton Energy Services to “log” the well,
 
 ie.,
 
 creating a log showing the temperature and depth of the well. Boutte was employed by Halliburton Energy Services as a wireline operator.
 

 Although drilling rigs vary in size and appearance, they possess several generic features. To prevent a blowout, well control equipment is installed directly above the borehole.
 
 [1]
 
 To elevate the drilling apparatus above the well control equipment,
 
 *716
 
 a substructure of steel beams supports a rig floor that is typically ten to thirty feet or more above the surface of the ground.
 
 [2]
 
 The rig floor is normally accessed via a metal stairway. A wall or railing around the perimeter of the rig floor prevents workers from falling over the side of the rig floor. A prominent “derrick” or mast sits atop the rig floor.
 
 [3]
 
 Drill pipe is usually stacked beside the rig on a pipe rack, three to four feet above the ground.
 
 [4]
 
 Pipe is transported to the rig floor by first rolling it onto an adjacent catwalk, and then dragging it up an inclined slide variously called the pipe ramp, V-door ramp, or slide.
 
 [5]
 
 At the top of the pipe ramp is the V-door, an opening in the perimeter of the rig floor or railing through which pipe or other heavy objects can be dragged onto or above the rig floor.
 
 [6]
 

 
 *717
 
 [[Image here]]
 

 On January 9, 1998, Boutte arrived at the well with the other members of the Halliburton crew (another operator and a supervisor) to “log” the well. In this case, the “logging” involved inserting a depth meter (the “tool”) into the uncased well.
 
 [7]
 
 Thus, before Halliburton could log the well, Grey Wolf had to pull the drill pipe out of the well, leaving the borehole in danger of collapse. Accordingly, time was of the essence.
 

 
 *718
 
 [[Image here]]
 

 The logging tool was thirty feet long, five to six inches in diameter, and weighed 500 pounds. The Halliburton crew set up the tool, led it along the catwalk, slid it up the V-door ramp with wires and pulleys, and placed the tool inside the well. From the rig floor, it was Boutte’s job to guide the tool into the well opening. The Halliburton crew encountered problems on their first attempt to get the tool down the well hole. After a few unsuccessful attempts to the get the tool to the bottom, it was decided that the well should be “swabbed,” requiring Grey Wolf to put its drilling pipe back in the well. The Halliburton crew “rigged down” and left the well site.
 

 At 7:00 p.m., the following day, January 10, 1998, Halliburton returned to the rig in another attempt to log the well. The Halliburton crew set up their equipment and ran the tool along the catwalk, up the pipe ramp, and into the well. Halliburton ran the tool 200 to 500 feet down the borehole.
 
 *719
 
 When the crew tested the tool, they could not obtain any readings. Halliburton again pulled the tool out of the well and ran it in the hole two or three more times, but still could not obtain any readings. The Halliburton crew then pulled the tool from the well and lowered it onto the catwalk.
 

 The Halliburton crew attempted to use a second tool, but after running it down the hole, discovered it was not working either. The Halliburton engineer decided to break down the tools and “swap” parts. Each tool has a mechanical part and an electrical part. Because Halliburton did not know which part — the mechanical or electrical— was not working properly, it was decided to swap the mechanical and electrical parts on the two tools. The Halliburton crew then proceeded to break down the tools on the catwalk and exchange their parts. When Halliburton tested the tools on the catwalk, they still did not work. Halliburton then decided to swap the parts on the tools again, which required breaking down the tools a second time. As Boutte was attempting to break down one of the 500-pound tools by “shaking” it, he slipped and fell on the catwalk.
 

 Boutte sued Grey Wolf for negligence for injuries to his right knee and back allegedly sustained from his fall.
 
 [8]
 
 Boutte alleged that while working on the tool, he slipped on oil-based drilling mud which Grey Wolf allegedly had allowed to accumulate in the area of the catwalk on which he was working. Asserting that he was a business invitee at the time of the accident, Boutte alleged Grey Wolf failed to exercise ordinary care to keep the rig in a reasonably safe condition by failing to remove the mud in a reasonably prudent manner. After finding Grey Wolf negligent, the jury awarded Boutte $220,500 for past damages and $212, 500 for future damages.
 

 I. Legal and Factual Sufficiency Standard of Review
 

 When reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the jury’s findings, and disregard all contrary evidence and inferences.
 
 Wal-Mart Stores, Inc. v. Canchola,
 
 121 S.W.3d 735, 739 (Tex.2003) (per curiam). A no-evidence challenge will be sustained when (1) the record discloses a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.
 
 Uniroyal Goodrich Tire Co. v. Martinez,
 
 977 S.W.2d 328, 334 (Tex.1998). A no-evidence point will be rejected if more than a scintilla of evidence supports the finding.
 
 Canchola,
 
 121 S.W.3d at 739. More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.
 
 Rocor Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA.,
 
 77 S.W.3d 253, 262 (Tex.2002).
 

 In conducting a factual sufficiency review, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
 
 Cain v. Bain,
 
 709 S.W.2d 175, 176 (Tex.1986) (per curiam). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of
 
 *720
 
 the trier of fact, even if a different answer could be reached on the evidence.
 
 Maritime Overseas Corp. v. Ellis,
 
 971 S.W.2d 402, 407 (Tex.1998);
 
 Knox v. Taylor,
 
 992 S.W.2d 40, 50 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The amount of evidence necessary to affirm the judgment is far less than necessary to reverse a judgment.
 
 Bracewell v. Bracewell,
 
 20 S.W.3d 14, 23 (Tex.App.-Houston [14th Dist.] 2000, no pet.);
 
 Knox,
 
 992 S.W.2d at 50.
 

 II. Duty
 

 A landowner or one who is otherwise in control of the premises has a duty to use reasonable care to make the premises safe for the use of business invitees.
 
 Lefmark Mgmt. Co. v. Old,
 
 946 S.W.2d 52, 53 (Tex.1997);
 
 McIntosh v. NationsBank,
 
 963 S.W.2d 545, 548 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). Whether a duty exists is a question of law.
 
 Texas Home Mgmt., Inc. v. Beany,
 
 89 S.W.3d 30, 33 (Tex.2002). The invitee must establish the following elements to prevail on his premises liability claim: (1) the premise owner or occupier had actual or constructive knowledge of a condition; (2) the condition posed an unreasonable risk of harm; (3) the owner or occupier did not exercise reasonable care to reduce or eliminate the risk; and (4) the owner or occupier’s failure to use such care proximately caused the plaintiffs injury.
 
 CMH Homes, Inc. v. Daenen,
 
 15 S.W.3d 97, 99 (Tex.2000).
 

 A. Objectively Obvious Condition
 

 Grey Wolf argues that it cannot be liable under a theory of premises liability because the evidence established that the allegedly dangerous condition was objectively obvious as a matter of law. The “no duty” doctrine provides that if there are open and obvious dangers of which the invitee is aware, or is charged with knowledge of, then the occupier owes the invitee “no duty” to warn or protect the invitee.
 
 Parker v. Highland Park, Inc.,
 
 565 S.W.2d 512, 516 (Tex.1978). However, in
 
 Parker,
 
 the Texas Supreme Court abolished the “no duty” doctrine.
 
 Id.
 
 at 517. Instead, “[t]he reasonableness of an actor’s conduct under the circumstances will be determined under principles of contributory negligence.”
 
 Id.
 

 Grey Wolf acknowledges that the plaintiffs
 
 subjective
 
 knowledge of a dangerous condition is not relevant to the determination of the defendant’s duty, but is relevant to the invitee’s contributory negligence.
 
 See id.
 
 However, Grey Wolf argues the issue here is whether a premises owner has a duty to warn of a danger that is
 
 objectively
 
 obvious to an average person in Boutte’s position. In support of its assertion, Grey Wolf relies on a products liability case.
 
 See Sauder Custom Fabrication, Inc. v. Boyd,
 
 967 S.W.2d 349 (Tex.1998) (per curiam). In
 
 Sauder Custom Fabrication,
 
 the Texas Supreme Court held a manufacturer or distributor does not have a duty to warn of risks that are objectively obvious from the perspective of the average user of the product.
 
 Id.
 
 at 351. Grey Wolf argues that the Supreme Court’s language in
 
 Coastal Marine Service of Texas, Inc. v. Lawrence
 
 suggests the same rule applies in premise defects cases. 988 S.W.2d 223 (Tex.1999) (per curiam).
 

 In
 
 Lawrence,
 
 the Supreme Court set forth two categories under the premises defect theory of liability: (1) defects existing on the premises when the independent contractor/invitee entered the premises, and (2) defects created by the independent contractor’s work activity.
 
 Id.
 
 at 225. With respect to defects existing on the premises when the independent contractor/invitee enters,
 
 Lawrence
 
 provides that the premises owner has a duty to inspect the premises and warn the independent contractor/invitee of dangerous conditions that are
 
 “not open and obvious
 
 ” and that
 
 *721
 
 the owner knows or should have known exist.
 
 Id.
 
 (emphasis added).
 

 We find
 
 Lawrence
 
 is not applicable to this case because Boutte and his expert, Edward Ziegler, testified that the catwalk was not unreasonably dangerous when Halliburton entered the premises. Moreover, there is no indication in
 
 Lawrence,
 
 that the court intended that the determination of whether a condition is “open and obvious” be considered objectively. We decline to extend
 
 Sander Custom Fabrication
 
 to this premises liability claim. This issue is overruled.
 

 B. Creation of a Dangerous Condition
 

 Boutte claims Grey Wolf created a dangerous condition on the catwalk by permitting oil-based drilling mud to drip and accumulate on the catwalk and by then failing to remove the accumulated mud from the catwalk; thus, having created the unsafe condition, Grey Wolf had a duty to remedy that condition and make the catwalk safe.
 
 [9]
 
 Grey Wolf, on the other hand, contends the source of the drilling mud was due to Halliburton’s activities,
 
 ie.,
 
 inserting, removing, dismantling, and shaking the tool over the catwalk.
 

 Generally, a person who does not own, occupy, or otherwise control the premises cannot be held liable for dangerous conditions.
 
 City of Denton v. Page,
 
 701 S.W.2d 831, 835 (Tex.1986). One who creates a dangerous condition, even though not in control of the premises when the injury occurs, owes a duty of care.
 
 Lefmark Mgmt. Co.,
 
 946 S.W.2d at 54;
 
 Science Spectrum, Inc. v. Martinez,
 
 941 S.W.2d 910, 912 (Tex.1997).
 

 Here, no question regarding the source of the dangerous condition,
 
 ie.,
 
 whether Grey Wolf or Halliburton created a dangerous condition, was submitted to the jury; thus, there is no finding on this element. Pursuant to Rule 279 of the Texas Rules of Civil Procedure, when the jury awards damages based on a charge that omits an element necessary to sustain a ground for recovery, the trial court can file a written finding on the missing element or render judgment without a finding. Tex.R. Civ. P. 279;
 
 State Farm Life Ins. Co. v. Beaston,
 
 907 S.W.2d 430, 437 (Tex.1995). If the trial court does not file a written finding, the omitted element is deemed found in support of the judgment if there was no objection and there is factually sufficient evidence to support such a finding. Tex.R. Crv. P. 279;
 
 Beaston,
 
 907 S.W.2d at 437. Here, the trial court did not make a written finding. Because Grey Wolf did not object to the omission of the element of creation of a dangerous condition, it will be deemed found in support of the jury’s finding on premises defect if the evidence is factually sufficient to support the finding.
 

 Boutte asserts the source of the mud on the catwalk was mud dripping from drilling pipe stacked above the catwalk by Grey Wolf. Prior to the Halliburton crew commencing its work on January 10, 1998, Grey Wolf had swabbed the hole by inserting drilling pipe into the hole and then removing the pipe from the hole. After removing the drilling pipe from the hole, Grey Wolf stacked the pipe in front of the V-door above the catwalk. Boutte testified that as the Grey Wolf employees were pulling the pipe out the hole, they
 
 *722
 
 made no attempt to clean the pipe as it came out. Boutte testified that mud from the dirty pipe stacked in front of the V-door dripped on to the catwalk.
 

 Contrary to Boutte’s assertions, Grey Wolf asserts the evidence shows the source of the dangerous condition alleged by Boutte was actually Halliburton’s own activities. Grey Wolf points out that both Boutte and his expert, Edward Ziegler, testified that no dangerous condition existed on the catwalk when Halliburton entered the premises and began working. On January 10, 1998, when Halliburton ran its tool down the well hole, it was unable to get a reading and had to pull the tool out of the hole. Halliburton then ran its tool down the well hole again. Nevertheless, Halliburton still was unable to get a reading, pulled the tool out of the hole, and laid it on the catwalk. Grey Wolf contends that oily mud came out of the hole each time Halliburton pulled the tool out. Boutte, however, testified that each time the Halliburton crew pulled the tool out of the hole, there was “air blowing on the cable ... [to] blow the oil off as it’s coming out.” Additionally, Boutte used “absorption rags” to wipe off the oil on to the top of the hole so that he did not “have a mess everywhere.” Grey Wolf points that despite Boutte’s best efforts, some oil came out of the hole:
 

 Q. Of course evidently some mud does come out a little bit?
 

 A. Yeah, I can’t stop it all. But I can keep it to a minimum.
 

 Ziegler further admitted that when the tool was pulled out of the hole, “[i]t’s going to have some mud, yes.”
 

 When asked about whether mud dripped from the tool on to the catwalk, Boutte explained that mud was coming off the mechanical end of the tool — the far end from the electronic end of the tool where Boutte was working. According to Boutte, no mud came off the electronic end of the tool.
 

 There is some evidence in the record that mud came from Grey Wolfs stacked drill pipe and from Halliburton’s tool. As shown by Boutte’s testimony:
 

 The whole catwalk — the longer we start breaking tools there is more and more [mud] coming all over the catwalk, plus not counting what’s coming off the drill pipe sitting in the derrick for hours, I mean, you know.
 

 Grey Wolf argues that although Boutte claimed to see mud dripping from Grey Wolfs drill pipe onto the catwalk, there is no evidence that he slipped in that mud as opposed to the mud from Halliburton’s tools. When questioned during trial about what percentage of the mud that had accumulated on the catwalk came from the drilling pipe versus what percentage came from Halliburton’s tool, Ziegler testified that he could not give a percentage amount for either source, but stated that mud came from both sources.
 

 Boutte testified that mud continued to creep down the catwalk towards where he was working. Grey Wolf points out that when Boutte came down to the catwalk to help break down Halliburton’s tools, the drilling pipe had been out of the well “for hours.” Ziegler testified that temperature effects how slippery drilling mud is. The outside air temperature at the time of Boutte’s accident was apparently cold: it was January and Boutte testified he was wearing insulated overalls with warm material underneath. Ziegler explained that oil-based mud becomes cold like the outside air to which it is exposed. Oil-based mud exposed to cold air “tend[s] to be more tacky and sticky rather than slippery.” The temperature in the well increases as it becomes deeper; therefore, mud coming directly from the well, ie., from the tool just pulled out of the hole, is
 
 *723
 
 going to be warmer, making it more slippery. Therefore, according to Grey Wolf, the mud dripping from Halliburton’s tools directly onto the catwalk was more likely to create a slippery condition than mud on drilling pipes that had allegedly been sitting out of the well in early January “for hours.”
 

 While Grey Wolfs logic is persuasive, we are not the factfinder. Considering the evidence both in support of and contrary to the finding, we cannot say a finding that the source of the mud was the drilling pipe stacked by Grey Wolf is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Thus, because there is some evidence of it having created a dangerous condition, we hold Grey Wolf had a duty to remedy the situation if it had knowledge of the dangerous condition.
 

 III. Knowledge of Unreasonably Dangerous Condition
 

 Grey Wolf contends Boutte did not present legally and factually sufficient evidence that it knew or should have known either mud had accumulated on the catwalk or that the presence of mud posed an unreasonably dangerous condition.
 

 To prevail on a claim for premises liability, the plaintiff must prove the premises owner/occupier had actual or constructive knowledge of the dangerous condition.
 
 Wal-Mart Stores, Inc. v. Reece,
 
 81 S.W.3d 812, 814 (Tex.2002). Actual knowledge is direct knowledge of what a person actually knows. Black’s Law Dictionary 876 (7th ed.1999). Constructive knowledge can be established by demonstrating the condition had existed long enough for the owner/occupier to have discovered it upon reasonable inspection.
 
 CMH Homes, Inc.,
 
 15 S.W.3d at 102-03. Although the fact that the owner/occupier of a premises created a condition that posed an unreasonable risk of harm may support an inference of knowledge, the jury still must find that the owner/occupier knew or should have known of the condition.
 
 Keetch v. Kroger Co.,
 
 845 S.W.2d 262, 265 (Tex.1992).
 

 Although Boutte testified he saw mud on the catwalk near the V-door ramp and that mud was “creeping” down the catwalk, Grey Wolf contends Boutte presented no evidence that any Grey Wolf employee saw mud on the catwalk or that anyone from Halliburton ever brought the presence of the mud to Grey Wolfs attention. Instead, when Boutte and the Halliburton crew arrived at the rig, the catwalk was “relatively dry” and Boutte had no complaints about the condition of the catwalk. Ziegler explained that the condition of the catwalk changed over a period of time. However, Grey Wolf employees were not allowed on the catwalk while Halliburton was logging the well.
 

 Grey Wolf further argues that even if mud were dripping from the stacked drill pipe onto the catwalk, Boutte presented no evidence as to how long this mud had created a dangerous condition. Grey Wolf contends that Boutte must show it is more likely than not that the condition existed long enough to give Grey Wolf a reasonable opportunity to discover it.
 
 See Reece,
 
 81 S.W.3d at 814. The “time-notice rule” is based on the notion that temporal evidence best indicates whether the owner/oecupier had a reasonable opportunity to discover and remedy a dangerous condition.
 
 Id.
 
 at 816. 'Without some temporal evidence, there is no basis upon which the factfinder can reasonably assess the opportunity the premises owner had to discover the dangerous condition.”
 
 Id.
 
 What constitutes a reasonable time for a premises owner to discover a dangerous condition necessarily depends on the facts and circumstances of the case; the proximity of a defendant’s employee to
 
 *724
 
 the condition may be relevant to the analysis.
 
 Id.
 
 The supreme court emphasized that before liability can be imposed on the premises owner/oceupier for failing to discover and rectify, or warn of, the dangerous condition, there must be some evidence of how long the hazard was there.
 
 Id.
 
 Otherwise, owners/occupiers would face strict liability for any dangerous condition on their premises, an approach the supreme court has “clearly rejected.”
 
 Id.
 

 Grey Wolf contends that Boutte’s testimony that this mud was a “couple of feet away” from where he was working when he first came down from the rig floor to the catwalk and Ziegler’s testimony that the catwalk became dangerous at some unknown point while Halliburton was working is no evidence that the dangerous condition had existed for a long enough time for Grey Wolf to have had an opportunity to discover it.
 

 As noted by Grey Wolf, when Boutte first started working on the catwalk, the mud on the catwalk was a couple feet away from where Boutte was standing. Ziegler testified that Boutte was on the catwalk for one to three hours, while Boutte testified that he was on the catwalk for more than an hour trying to help break down the tools when he fell. Boutte explained that mud had been dripping from the stacked drill pipe “for hours” and was “creeping down the catwalk” while he was working on the tool. Boutte further testified that while he was on the catwalk, Grey Wolf employees were watching him and hollering at the Halliburton crew to finish its job. While there is no testimony in the record as to precisely how high the rig floor was above the catwalk, Ziegler testified that the typical rig floor is between ten to thirty-two feet above the ground. He also testified that the catwalk is normally three or four feet above the ground. Thus, Boutte contends the jury could infer that the Grey Wolf employees, who were watching him from a rig floor that was as little as six feet and no more than twenty-nine feet above the catwalk, could see the muddy condition of the catwalk. Finally, Ziegler testified that Grey Wolf would know “all the different sources of oil based mud getting the catwalk.”
 

 The testimony showed that Boutte was on the catwalk for at least an hour prior to his fall and that mud was present on the catwalk for the entire time he was working on the catwalk. Grey Wolf, however, also contends Boutte cannot establish that it had a reasonable opportunity to discover the existence of a dangerous condition that developed while Halliburton was working on the catwalk because, as Grey Wolf points out, no Grey Wolf employees were on the catwalk while Halliburton was logging the well. It is undisputed, however, that Grey Wolfs employees were watching Boutte as he worked and “hollering” at the Halliburton crew to finish logging the well because they were anxious to get the pipe back in the well before it collapsed. Thus, we find the jury could infer that the Grey Wolf employees could see there was mud on the catwalk.
 

 Grey Wolf further asserts the evidence is legally and factually insufficient to support a finding that Grey Wolf should have lmown the catwalk was unreasonably dangerous. Boutte and Ziegler testified that workers in Boutte’s position often work in mud. Until he fell, Boutte did not think the catwalk was too slippery for him to work safely. Boutte, on the other hand, contends Grey Wolf knew the presence of oil-based drilling mud on the catwalk was a dangerous condition. For example, Grey Wolfs safety manual identifies drilling mud as a “slipping hazard” or “hazard”:
 

 • Floormen should wash down each stand of a pulled drill pipe with a water hose to prevent excess build up of mud on the rig floor and pipe rack,
 
 *725
 
 unless oil-base[d] mud is used. Drilling mud will become a slipping hazard.
 

 • As drilling mud drains out of the racked stands of drill pipe, the mud should be hosed or squeegeed off the pipe rack to eliminate a slipping hazard.
 

 • In most cases drilling mud will splash out when a connection has been made, causing [a] slippery condition. The floor should be washed down as quickly as possible to eliminate this hazard.
 

 Grey Wolf complains that statements in its safety manual to the effect that it knew that drilling mud can be a hazard is not evidence that it
 
 actually knew
 
 there was mud on the catwalk. We agree with this particular contention.
 
 See Big Bend Flying Serv., Inc. v. Hinojos,
 
 489 S.W.2d 694, 696 (Tex.Civ.App.-El Paso 1978, no writ) (stating “knowledge that a given condition is dangerous is vastly different from knowledge that a dangerous condition actually exists.”). However, Boutte has presented
 
 some
 
 evidence that Grey Wolf knew mud was on the catwalk and the safety manual shows Grey Wolf knew the accumulation of oil-based mud can create an unreasonably dangerous condition.
 

 We conclude the evidence is legally and factually sufficient to support a finding that Grey Wolf had either actual or constructive knowledge that mud had accumulated on the catwalk, that Grey Wolf had a reasonable opportunity to discover the presence of the mud, and that Grey Wolf knew the accumulation of oil-based drilling mud could create a dangerous condition. Accordingly, we overrule this issue.
 

 IV. Proximate Cause of Boutte’s Fall
 

 Grey Wolf contends the evidence is legally and factually insufficient to establish that Boutte’s fall was caused by the dangerous condition,
 
 i.e.,
 
 the build-up of “heavy mud” on the catwalk. Grey Wolf claims Boutte presented no evidence that he fell as a result of any mud on the sidewalk, but, instead, testified during cross-examination that he does not know what caused him to fall:
 

 Q. How did you fall?
 

 A. Well, as I was shaking the tool — I don’t even know how. Just my leg went one way and the other leg went like it tried to go that way. And I just went straight down, you know.
 

 Grey Wolf also cites to testimony on direct examination in which Boutte speculates that he slipped on the “indentures” in the surface of the catwalk:
 

 Q. Was it what you just described it was, a film of mud on the catwalk, where you were working when you slipped?
 

 A. And had these little indentures at that point where pipe would come down and hit that, you know, these little — it wasn’t a flat surface. Like they had like little ruts in it.
 

 Q. You’re not testifying that you slipped in the indentures; are you?
 

 A. I don’t know what. I just slip. I just know I slipped on the catwalk. As far as the exact spot I was standing, I couldn’t tell you if they have an indenture an inch away from me. My foot got in one of them. I can’t say, you know.
 

 However, Boutte also testified that he slipped in the mud:
 

 Q. When you’re shaking the tool and you slip, what did you slip on?
 

 A. I slipped on, I guess, the oil surface that was there. There was nothing else. There was nothing underneath my feet other than the catwalk.
 

 Q. There was mud underneath your feet? That’s the allegation in this case; right?
 

 A. There was mud, those little indentures, there was the catwalk.
 

 
 *726
 
 Q. Are you saying you slipped in the indentures?
 

 A. I’m not saying that. I’m saying that there was mud. The catwalk wasn’t a smooth surface like this. They had like little indentures in all spots. I just knew I slipped where they had indentures around me. They had mud underneath, you know. And when I fell in the mud, because I got covered all in my back. I could feel it. I could see I had mud all over me.
 

 Moreover, Grey Wolf employee Daniel Guidry testified that at a safety meeting the morning following Boutte’s accident, the tool pusher announced that a Halliburton employee had slipped in oil-based mud on the catwalk. Dr. John Cobb testified that Boutte told him that he was injured when he slipped in oil-based mud while he was working.
 

 While Boutte’s testimony is at times imprecise, conflicting, and difficult to understand, it is the province of the jury to resolve conflicts in the evidence. Examining the record before us, we cannot say the evidence is legally and factually insufficient to support a finding that the proximate cause of Boutte’s fall was the presence of oil-based mud on the catwalk. Accordingly, this issue is overruled.
 

 V. Contributory Negligence
 

 Grey Wolf claims the jury’s finding that Boutte was not negligent is against the great weight and preponderance of the evidence. Because Grey Wolf challenges the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.
 
 Dow Chem. Co. v. Francis,
 
 46 S.W.3d 237, 242 (Tex.2001) (per curiam). In reviewing a complaint that the jury’s finding is against the great weight and preponderance of the evidence, we must examine the entire record to determine if there is some evidence to support the finding.
 
 Oadra v. Stegall,
 
 871 S.W.2d 882, 892 (Tex.App.-Houston [14th Dist.] 1994, no writ). Only if the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, must we sustain the challenge.
 
 Id.
 
 Because the appellate court is not the factfinder, it may not substitute its own judgment for that of the jury, even if a different answer could be reached on the evidence.
 
 Knox,
 
 992 S.W.2d at 50;
 
 Peter,
 
 915 S.W.2d at 649.
 

 Grey Wolf points out that Boutte was aware of both the existence of the mud on the catwalk and the risks involved in working in oil-based drilling mud, and that Boutte and the Halliburton crew chose to “break down” the tool as close to the pipe ramp as possible to save time, even though Boutte claimed mud was accumulating there.
 

 The evidence also showed there was an urgency to Halliburton trying to finish its job. Ziegler testified that when the pipe is removed from the well, the well is “idle” and there is a risk that either the well will start deteriorating and subsequently collapse or start flowing. It was essential that Halliburton complete its work without delay so the pipe could be inserted back into the well. Boutte similarly testified that when they are working, they are aware that the well can collapse or that a “blow out” can occur when the pipe is out of the well. Boutte testified that while he was working on the catwalk, Grey Wolf employees were hollering at him to hurry because they were “going to lose our well.”
 

 Ziegler testified that working in mud is sometimes “an unavoidable situation.” Boutte also testified that working in mud is often part of the job. Boutte testified that he “tried [his] best” to work safely on the muddy catwalk. For example, prior to
 
 *727
 
 starting his work on the catwalk, Boutte used rags to wipe up mud that was on the catwalk. Boutte also used air to blow mud off the cable and rags to wipe mud off the tool as it was pulled out of the well in order to leave as much mud in the hole as possible. Boutte also wore rubber boots with treads, which is appropriate for working in oil-based drilling mud. Boutte explained that if his supervisor thinks it is safe enough to work, the crew continues to work in those conditions. In Ziegler’s opinion, Boutte acted as a reasonably prudent logging hand wire operator should under the same or similar circumstances, working as safely under the circumstances.
 

 While there is much evidence in the record before us that Boutte’s negligence contributed to the accident, we find the jury’s conclusion that Boutte was not con-tributorily negligent is not so against the great weight and preponderance of the evidence so as to be clearly wrong and manifestly unjust. Accordingly, this issue is overruled.
 

 VI. Damage Award
 

 The jury awarded Boutte $220,500 for past damages and $212,500 for future damages. Damages included physical pain and mental anguish, loss of earning capacity, physical impairment, and medical care. Boutte’s economic expert testified that Boutte’s total lost earning capacity was $406,441. Grey Wolf asserts the $433,000 damage award is excessive because although Boutte alleges that he sustained injury to both his back and knee as a result of his January 10, 1998 fall, that amount was largely based on evidence related to his back injury and his inability to work at Halliburton because of his back injury. Grey Wolf contends neither Boutte’s physician’s testimony nor Boutte’s testimony is sufficient to establish causation with respect to his back injury. Therefore, in the absence of evidence of causation regarding Boutte’s back injury, Grey Wolf argues evidence of damages attributable to Boutte’s knee injury is factually insufficient to support the damages award.
 
 [10]
 

 About twelve hours after the accident, Boutte was taken to a hospital in Fort Bend County where he was “checked out.” Boutte went home to New Iberia, Louisiana on crutches. Halliburton then sent Boutte to a doctor in New Iberia, who, in turn, referred him to Dr. William Cenac, an orthopedic surgeon. In February 1998, Dr. Cenac performed arthroscopic surgery on Boutte’s right knee. Afterwards, Boutte received therapy for his knee. In April 1998, Boutte returned to light duty work.
 

 Boutte testified he informed Dr. Cenac in March 1998, that he was experiencing back pain, but Dr. Cenac told him he would have to present his back problem to the Halliburton physician. Boutte’s medical records from his family physician, Dr. G.D. Sagrera, show that Boutte complained of back pain on June 12, 1998.
 

 On July 7, 1998, Dr. Cenac released Boutte to “regular duty status.” On July 8, 1998, Boutte went to the Medworks Clinic in New Iberia complaining of lower back pain. According to Medworks’ records, since returning to light duty work, Boutte had developed some lower back pain and Dr. Cenac had referred him back to the clinic “for evaluation and possible treatment of the lumbar pain.” Medworks recommended further follow up by an orthopedic specialist for continued knee pain and Ibuprofen and stretching exercises for his back pain.
 

 
 *728
 
 Boutte first saw Dr. John E. Cobb, who is board certified in both orthopedic surgery and spine surgery, in December 1998, for his back pain. At that time, Boutte told Dr. Cobb that he, had slipped in oil-based mud while working on the catwalk of an oil rig. On December 17, 1998, Dr. Cobb prescribed Boutte pain medication. In February 1999, Dr. Cobb performed an MRI, which revealed abnormalities in the two lower discs in Boutte’s back. Dr. Cobb recommended a surgical procedure on his back, but Boutte declined to undergo the procedure.
 

 Dr. Cobb last saw Boutte on March 22, 2000. At that time, Dr. Cobb believed Boutte should seek less physically demanding work — somewhere between light and medium level work, “which would imply that he would put about a 50 pound lifting restriction on his back if he does any lifting occasionally.”
 

 Dr. Cobb stated that he does not know exactly when Boutte’s back pain started,
 
 ie.,
 
 whether it started at the time of the accident or whether it started later on, and he did not specifically ask, but Boutte indicated to him that he had suffered back pain all along, and as he became more active, his back became worse, which is the reason Boutte came to see him. Dr. Cobb explained that Boutte’s not complaining of back pain (annular tear) for four or five months after the accident is “somewhat surprising, but not terribly unusual.... [I]t’s not the typical situation, I don’t think.”
 

 Dr. Cobb originally opined that based upon reasonable medical probability, Boutte’s January 10, 1998 fall caused his back injury. Dr. Cobb explained that this is the type of injury that is likely to cause physical pain in the future and Boutte will probably experience some chronic pain. Dr. Cobb further stated that Boutte’s back injury could significantly impair his ability to use his back, ie., lifting, bending, and twisting. Dr. Cobb concluded that Boutte could not return to work as a wireline operator, but that he could do light to medium type work.
 

 Grey Wolf complains Dr. Cobb’s testimony is factually and legally insufficient to support causation. While Dr. Cobb initially based his opinion that the January 10, 1998 fall caused Boutte’s back injury upon reasonable medical probability, he came to that conclusion without any knowledge that Boutte had suffered from back and neck pain from injuries sustained in an automobile accident in 1993, or that Boutte had fallen down some stairs at work in 1981. Boutte did not inform Dr. Cobb that he had experienced any prior problems with his back, neck, or knee.
 

 “Reasonable medical probability” concerns the showing that must be made to support an ultimate finding of fact, not the standard by the which the medical expert must testify.
 
 Lenger v. Physician’s Gen. Hosp., Inc.,
 
 455 S.W.2d 703, 707 (Tex.1970). The plaintiff is not required to establish causation in terms of medical certainty; nor is he required to exclude every other reasonable hypotheses.
 
 Bradley v. Rogers,
 
 879 S.W.2d 947, 954 (Tex.App.-Houston [14th Dist.] 1994, writ denied). While expert testimony concerning the possible causes of the condition in question is admissible to assist the trier of fact in evaluating other evidence in the case, a possible cause only becomes probable when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.
 
 Parker v. Employers Mut. Liability Ins. Co.,
 
 440 S.W.2d 43, 47 (Tex.1969). It is “not absolutely necessary” for the expert to couch his opinion in terms of “reasonable medical probability.”
 
 Duff v. Yelin,
 
 751 S.W.2d 175, 176 (Tex.1988).
 

 
 *729
 
 With respect to knowledge of those prior accidents, Dr. Cobb testified “I don’t know if it would have had any bearing on — on my feeling in terms of causation.” Dr. Cobb admitted that Boutte could have had back pain prior to January 10, 1998, and that it is possible Boutte’s back pain could have started at the time of the automobile accident in 1993. However, Dr. Cobb testified that if Boutte had been experiencing pain in his back to this extent, it probably would have affected his “functional capacity,” and he probably would have sought medical attention. Dr. Cobb testified:
 

 Q. So ... knowing all of the complete picture, can you still say that— with a reasonable degree of medical probability that this particular lower back injury was caused specifically by that accident of January 10,1998?
 

 A. Well, as I mentioned, in terms of what you provided me about some of the events that may have occurred prior to this, there’s no indication that he had chronic pain from that. If we assume that he had an automobile accident which led to these injuries and he had chronic pain, then that would be something else. If I don’t have that history — I mean, I’m kind of relying on the history.
 

 What you’ve indicated to me is not enough information for me to tell you that this more probably came from this automobile accident, you know. I mean, certainly, automobile accidents can cause disk related injuries. I don’t have that — enough information to say that it’s more probable that that accident caused it than the one we’re talking about here. I mean, I’m relying on him telling me about the onset of it, and what I gathered from him, he — he indicated to me that his knee and his back hurt along [sic], but his back got worse. So, apparently, it wasn’t as bad initially as it was when he first came to see me, but I don’t have enough information to tell you that there’s something else that caused it, really.
 

 Q. But you don’t have enough information from — from when you started seeing him to be able to ruled [sic] those out, correct, if you’re just finding out about those right now?
 

 A. Well, I’d have — again, I’d have to look — I’d have to look at more history, if there’s more available, to support that as being the cause of his back as opposed to this right here.
 

 After being told that Boutte had been involved in other accidents, Dr. Cobb testified that “automobile accidents can cause disk related injuries. I don’t have ... enough information to say that it’s more probable that that [automobile] accident caused it than the one we’re talking about here.” While Dr. Cobb was not required to exclude all other reasonable hypotheses, he was not able to say, without more information on Boutte’s medical history, that it was more probable that one event or the other,
 
 i.e.,
 
 the fall on the catwalk or the automobile accident, caused Boutte’s back injury. Therefore, Dr. Cobb’s testimony is not legally or factually sufficient to support a finding that Boutte’s January 10, 1998 fall caused his back injury.
 

 Grey Wolf similarly complains that Boutte’s testimony is also not legally or factually sufficient to support a finding that his fall on the catwalk caused his back injury. Grey Wolf points out that the first written complaint of Boutte’s back pain appears in June 12, 1998 medical records from Dr. Sagrera’s office — five months after his fall. Grey Wolf, thus, argues the gap in time between the accident and the reporting of the back pain does not provide “a strong, logically traceable connection between cause and result” and, therefore, is too speculative to support a finding of proximate cause between Boutte’s fall and
 
 *730
 
 his back injury.
 
 See Griffin v. Texas Employers’ Ins. Ass’n,
 
 450 S.W.2d 59, 61 (Tex.1969).
 

 Lay testimony is sufficient to establish causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition.
 
 Morgan v. Compugraphic Corp.,
 
 675 S.W.2d 729, 733 (Tex.1984);
 
 Lenger,
 
 455 S.W.2d at 706. Lay testimony that establishes a sequence of events providing a “strong, logically traceable connection between the event and the condition is sufficient proof of causation.”
 
 Morgan,
 
 675 S.W.2d at 733;
 
 see also Griffin,
 
 450 S.W.2d at 61 (“If proof only shows that one event followed another with a long period of time in between, it is at least as reasonable to conclude that the events are coincidentally related as causally related.”).
 

 Boutte testified that he experienced stiffness in his back after his fall. After he was no longer taking pain medication, he noticed that the stiffness in his back had not subsided. Boutte testified that he reported his back pain in March 1998, to Dr. Cenac, who referred him back to the Halliburton doctor.
 

 Prior to starting work for Halliburton, Boutte also took a “Pre-Work Screen” (physical examination) in January 1996, which shows that Boutte was able to meet the various categories of physical movement, including lifting, front carry, repetitive squats, overhead work, pushing, pulling, climbing, sustained crouching, balancing, hoisting, and grip strength. The critical demands required that Boutte be able to lift 100 pounds 48 inches off the floor and to front cany 150 pounds— requirements that Boutte satisfied. The pre-work screen stated that Boutte’s “LpJhysical abilities do match the functional requirements of the Logging job description.” Boutte testified he was no longer able to meet the requirements of this test after the accident.
 

 Boutte testified that he experiences stiffness in his back and is uncomfortable if he sits too long a period of time. He also experiences a sharp pain if he bends over too fast. Boutte stated he cannot return to Halliburton because he is unable to lift more than 50 pounds. Prior to his accident, Boutte was able to lift one end of the logging tool weighing 500 pounds. If Boutte had been having problems with his back prior to his fall, he would not have been able to lift the tool or perform any of the other heavy lifting required for his job. We find Boutte’s testimony provides a “strong, logically traceable connection between” the January 10, 1998 fall and Boutte’s back injury and, therefore, is legally and factually sufficient to establish the causal relationship.
 

 Boutte’s economic expert, Dr. Kenneth McCoin, was asked to determine Boutte’s loss of earning capacity. McCoin’s testimony demonstrates that Boutte’s total lost earning capacity is $406,441, based on Boutte’s inability to work as a wireline operator after the accident, but instead having to work a job after the accident that pays less. Additional evidence showing medical expenses of over $29,000 was presented at trial. Finally, Boutte testified as to his physical pain and physical impairment. We find the evidence is factually sufficient to support the award of damages. Accordingly, this issue is overruled.
 

 VII. Jury Argument
 

 Although Boutte claims that his back injury was caused by his fall on January 10, 1998, the first written complaint of any back problem is found in Dr. Sagrera’s records on June 12,1998—a few days after Boutte had retained an attorney to represent him in his claims against Grey Wolf
 
 *731
 
 on June 8, 1998. Grey Wolfs trial counsel attempted to point out to the jury that Boutte’s first recorded complaint of back pain came only a few days after he had retained an attorney. Grey Wolf claims the trial court erred in refusing to allow its trial counsel to argue that the jury could draw an inference that Boutte’s fall was not the cause of his back injury.
 

 Control over counsel’s argument to the jury is within the sound discretion of the trial court.
 
 National Union Fire Ins. Co. of Pittsburgh, Pa. v. Soto,
 
 819 S.W.2d 619, 624 (Tex.App.-El Paso 1991, writ denied). It is proper for counsel to argue reasonable inferences from the evidence.
 
 Gorman v. Life Ins. Co. of N. Am.,
 
 859 S.W.2d 382, 389 (Tex.App.Houston [1st Dist.] 1993, no writ). It may well have been reasonable to infer that because there was no written record of any back pain until four days after Boutte had seen a lawyer that his back injury was not caused by his fall on the catwalk. However, if the trial court erred in excluding the evidence, we find it to be harmless. The jury heard conflicting evidence regarding when Boutte first experienced back pain. Boutte’s testimony was that he began experiencing back pain almost immediately after the fall; however, his first written complaint regarding back pain was five months after the fall and shortly after he retained an attorney. Greywolf’s counsel was permitted to forcefully argue that Boutte’s back pain was either fraudulent or unrelated to the fall.
 
 [11]
 
 Finding the trial court’s action probably did not cause the rendition of an improper judgment, we find the error, if any, was harmless. Accordingly, this issue is overruled.
 

 VIII. Dismissal of Jurors for Cause
 

 Grey Wolf asserts the trial court abused its discretion by erroneously dismissing several jurors for cause, resulting in an
 
 *732
 
 unequal apportionment of peremptory challenges. Grey Wolf complains that Boutte’s counsel asked questions of the venire panel during voir dire that were designed to ask panel members whether they would consider particular facts that were to be introduced into evidence as conclusive to their determination of whether Boutte or Grey Wolf was negligent.
 

 Voir dire examination falls within the sound discretion of the trial court.
 
 Babcock v. Northwest Mem’l Hosp.,
 
 767 S.W.2d 705, 709 (Tex.1989). A party should be allowed broad latitude during voir dire examination so as to enable the party to discover any bias or prejudice by potential jurors and intelligently exercise peremptory challenges.
 
 Id.
 
 However, a question that attempts to commit a potential juror to a particular outcome or a determination of the weight given the evidence is improper.
 
 Vasquez v. Hyundai Motor Co.,
 
 119 S.W.3d 848, 855 (Tex.App.-San Antonio 2003, pet. granted) (en banc);
 
 Lassiter v. Bouche,
 
 41 S.W.2d 88, 90 (Tex.Civ.App.-Dallas 1931, writ ref'd).
 

 During voir dire, Boutte’s counsel asked the panel the following questions:
 

 Is there anybody here who would say, well, Mr. Boutte knew the mud was slippery and he continued to work instead of stopping work and risking a kick, as you call it, or a well hole collapsing. Anybody not going to listen to all the evidence and focus only on the fact that Mr. Boutte was experienced and he knew it was slippery?
 

 [[Image here]]
 

 Anyone here agree with Mrs. Romanov that no matter what’s going on out there, if Mr. Boutte knew the drilling mud was slippery when he was working there, that’s the end of the case? Anybody feel that way?
 

 At this point, Grey Wolfs trial counsel asked if they could approach the bench, and a discussion took place at the bench off the record. Following the discussion at the bench, Boutte’s counsel asked the following:
 

 Let me ask it a different way. Is there anyone here who given undisputed evidence — I’m telling you it will be undisputed that the drilling mud was slippery. Denfer Boutte knew he was working in slippery drilling mud and he continued to try to finish the Halliburton job. Anyone given those undisputed facts could not consider the rest of the evidence that will be presented to you regarding the urgency of the situation he was in?
 

 Boutte challenged, several potential jurors for cause based on those jurors’ responses to the above questions. Grey Wolf objected to those challenges. The trial court granted Boutte’s challenges for cause on five potential jurors. Grey Wolf complains that each instance of bias was entirely the result of the improper commitment question.
 

 Although Grey Wolf objected at the time Boutte challenged the jurors for cause, it did not object at the time Boutte’s attorney asked the voir dire panel the complained of questions. Even if we consider Grey Wolfe’s objection timely, we find the question finally put to the jurors was not an improper “commitment” question because it did not ask jurors to commit to a particular verdict or the weight they would give particular evidence,
 
 ie.,
 
 Boutte’s knowledge that he was working in oil-based drilling mud and that such mud is slippery, but, instead, only sought to discover any prejudice or bias on the part of the potential jurors,
 
 ie.,
 
 whether potential jurors would “listen to all the evidence” and “consider the rest of the evidence”
 
 *733
 
 before making a decision. Accordingly, this issue is overruled.
 

 While many of the aforementioned issues have arguable merit, we are obliged to yield to factual findings of the jury where the evidence is legally and factually sufficient even if the evidence would support a contrary finding. Moreover, we must also yield to discretionary rulings of the trial court where the lower court has not abused its discretion even if we might have ruled differently. The judgment of the trial court is affirmed.
 

 [1]
 

 . A "blowout” is "an uncontrolled flow of gas, oil, or other well fluids from the well.”
 
 U.S. Department of Labor: Occupational Safety & Health Administration,
 
 Oil and Gas Well Drilling and Servicing eTool: Glossary of Terms (November 11, 2004) < http:// www.osha.gov/SLTC/etools/ oilandgas/glos-sary_o£_terms/glossary_ojLterms_a.html >.
 

 "Well control” means "the methods used to control a kick and prevent a well from blowing out. Such techniques include, but are not limited to, keeping the borehole completely filled with drilling mud of the proper weight or density during operations, exercising reasonable care when tripping pipe out of the hole to prevent swabbing, and keeping careful track of the amount of mud put into the hole to replace the volume of pipe removed from the hole during a trip.”
 
 Id.
 

 A "borehole” or "wellbore” is “the hole drilled by the bit. A wellbore may have casing in it or it may be open (uncased); or part of it may be cased, and part of it may be open.”
 
 Id.
 

 [2]
 

 . The "rig floor” is "the area immediately around the rotary table and extending to each corner of the derrick or mast — that is, the area immediately above the substructure on which the rotary table, and so forth rest.”
 
 Id.
 

 [3]
 

 . The "derrick” is "a large load-bearing structure, usually of bolted construction. In drilling, the standard derrick has four legs standing at the corners of the substructure and reaching to the crown block. The substructure is an assembly of heavy beams used to elevate the derrick and provide space to install blowout preventers, casingheads, and so forth.”
 
 Id.
 

 [4]
 

 . "Drill pipe” is "the heavy seamless tubing used to rotate the bit and circulate the drilling fluid. Joints of pipe are generally approximately 30 feet long are coupled together by means of tool joints.”
 
 Id.
 

 "Pipe racks” are "horizontal supports for tubular goods.”
 
 Id.
 

 [5]
 

 . The "catwalk” is "the elevated work area adjacent to the V-door and ramp on a drilling rig where pipe is laid to be lifted to the derrick floor by the catline or by an air hoist.”
 
 Id.
 

 The "pipe ramp” is "an angled ramp for dragging drill pipe, casing and other materials up to the drilling floor or bringing such equipment down.”
 
 Id.
 

 [6]
 

 . The "V-door” is "an opening at floor level in a side of a derrick or mast. The V-door is opposite the drawworks and is used as an entry to bring in drill pipe, casing, and other tools from the pipe rack.”
 
 Id.
 

 [7]
 

 . A “log” is "a systematic recording of data, such as a driller’s log, mud log, electrical well log, or radioactivity log. Many different logs are run in wells to discern various characteristics of downhole formation.”
 
 Id.
 

 A logging tool or “logging device” may be “any of several electrical, acoustical, mechanical, or radioactivity devices that are used to measure and record certain characteristics or events that occur in a well that has been or is being drilled.”
 
 Id.
 

 [8]
 

 . Boutte also sued Anschutz Exploration Corporation and Anschutz Gulf Coast Corporation. The trial court, however, granted summary judgment in favor of both Anschutz defendants.
 

 [9]
 

 . Boutte also asserts three additional reasons Grey Wolf owed him a duty to use reasonable care to
 
 keep
 
 the catwalk clean and safe: (1) Grey Wolf agreed in writing to keep the catwalk clean and safe, (2) Grey Wolf had com-píete control over the catwalk, and (3) Grey Wolf had the right of control over the injury-causing condition. In light of the disposition of this case, we need not address these other grounds.
 

 [10]
 

 .
 
 See Maritime Overseas Corp.,
 
 971 S.W.2d at 406 ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence.”).
 

 [11]
 

 . Greywolf’s counsel directed a large portion of his argument to the legitimacy of Boutte’s back injury. The following is but a small portion of that argument:
 

 Let’s talk about his injuries for a minute. Mr. Boutte falls. What he does he falls straight down on his knee and does some damage to his right knee that causes him to have arthroscopic surgery. And when he fell down the brunt of his weight fell onto his knee and tore his knee up. And that's what absorbed the weight of his body coming down onto the catwalk was his knee. It was not his back. This is why, folks, this stuff is undisputed. You’re going to have these records back in the back room in case you need them. If you look at the Polly Ryon Memorial Hospital records when he went there to the ER no mention of a back problem. If you look at the records of Doctor Cenac, who Mr. Boutte says he told virtually every time he went in there he was having problems with his back, there is not one note in here indicating he’s got a problem with his back. Not one. And, folks, he's relying on Doctor Cenac for treatment. These doctors are trained to write down the treatment and the complaints made to them in their notes. And it’s not until he gets to the first note that I can find any of this fellow’s medical records that he's complaining of a back problem is June of that year to his own physician. Then he’s going to see Doctor Cenac. And then he goes to see Doctor Cobb. Doctor Cobb's testimony is interesting in a lot of respects. And this is one that I want you to remember. The annular tear on the — annular tear in Mr. Boutte's back is on the left side of his spine. You probably were wondering why I asked him today when he was on the stand where does your back hurt? And his back hurts on the right side. And if you look at Doctor Cobb’s records consistently he is saying his back hurts on the right side. At the end of Doctor Cobb’s testimony today you heard him say this is moving around. That he is surprised at his reports of pain. Because there is nothing objective that ties in his reports of pain to the objective tests that he's seen. The reason he's surprised that this pain is being reported on his right side versus his left side is that the tear is on his left side. He ought to be hurting on his left side and he's reporting pain on the right.