Affirmed and Opinion filed December 14, 2004














Affirmed and Opinion filed December 14, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00735-CV

____________

 

GREY WOLF DRILLING COMPANY, L.P., Appellant

 

V.

 

DENFER BOUTTE, Appellee

 



 

On Appeal from the 268th District Court

Fort Bend County, Texas

Trial Court Cause No. 110,672

 



 

O P I N I O N

Grey Wolf Drilling Company, L.P., appeals the trial court=s judgment in favor of Denfer Boutte
on his premises liability claim for damages sustained as a result of a fall
while working on the rig.  We affirm.








Anschutz Exploration Corporation operated the Benton Trust #1
Well in Fort Bend County, Texas. 
Grey Wolf and Anschutz entered into a drilling contract under which Grey
Wolf would perform the drilling work on the well.  Anschutz also hired Halliburton Energy
Services to Alog@ the well, i.e., creating a
log showing the temperature and depth of the well.  Boutte was employed by Halliburton Energy
Services as a wireline operator.








Although drilling rigs vary in size and appearance, they
possess several generic features.  To
prevent a blowout, well control equipment is installed directly above the
borehole.[1]  To elevate the drilling apparatus above the
well control equipment, a substructure of steel beams supports a rig floor that
is typically ten to thirty feet or more above the surface of the ground.[2]  The rig floor is normally accessed via a
metal stairway.  A wall or railing around
the perimeter of the rig floor prevents workers from falling over the side of
the rig floor.  A prominent Aderrick@ or mast sits atop the rig floor.[3]  Drill pipe is usually stacked beside the rig
on a pipe rack, three to four feet above the ground.[4]  Pipe is transported to the rig floor by first
rolling it onto an adjacent catwalk, and then dragging it up an inclined slide
variously called the pipe ramp, V-door ramp, or slide.[5]  At the top of the pipe ramp is the V-door, an
opening in the perimeter of the rig floor or railing through which pipe or
other heavy objects can be dragged onto or above the rig floor.[6]

On January 9, 1998, Boutte arrived at the well with the other
members of the Halliburton crew (another operator and a supervisor) to Alog@ the well.  In this case, the Alogging@ involved inserting a depth meter
(the Atool@) into the uncased well.[7]  Thus, before Halliburton could log the well,
Grey Wolf had to pull the drill pipe out of the well, leaving the borehole in
danger of collapse.  Accordingly, time
was of the essence.

The logging tool was thirty feet long, five to six inches in
diameter, and weighed 500 pounds.  The
Halliburton crew set up the tool, led it along the catwalk, slid it up the
V-door ramp with wires and pulleys, and placed the tool inside the well.  From the rig floor, it was Boutte=s job to guide the tool into the well
opening.  The Halliburton crew
encountered problems on their first attempt to get the tool down the well
hole.  After a few unsuccessful attempts
to the get the tool to the bottom, it was decided that the well should be Aswabbed,@ requiring Grey Wolf to put its
drilling pipe back in the well.  The
Halliburton crew Arigged down@ and left the well site.








At 7:00 p.m., the following day, January 10, 1998,
Halliburton returned to the rig in another attempt to log the well.  The Halliburton crew set up their equipment
and ran the tool along the catwalk, up the pipe ramp, and into the well.  Halliburton ran the tool 200 to 500 feet down
the borehole.  When the crew tested the
tool, they could not obtain any readings. 
Halliburton again pulled the tool out of the well and ran it in the hole
two or three more times, but still could not obtain any readings.  The Halliburton crew then pulled the tool
from the well and lowered it onto the catwalk. 

The Halliburton crew attempted to use a second tool, but
after running it down the hole, discovered it was not working either.  The Halliburton engineer decided to break
down the tools and Aswap@ parts.  Each tool has a
mechanical part and an electrical part. 
Because Halliburton did not know which partCthe mechanical or electricalCwas not working properly, it was
decided to swap the mechanical and electrical parts on the two tools.  The Halliburton crew then proceeded to break
down the tools on the catwalk and exchange their parts.  When Halliburton tested the tools on the
catwalk, they still did not work. 
Halliburton then decided to swap the parts on the tools again, which
required breaking down the tools a second time. 
As Boutte was attempting to break down one of the 500-pound tools by Ashaking@ it, he slipped and fell on the
catwalk.

 

 

Generic Drilling
Rig  

Boutte sued Grey Wolf for negligence for injuries to his
right knee and back allegedly sustained from his fall.[8]  Boutte alleged that while working on the
tool, he slipped on oil-based drilling mud which Grey Wolf allegedly had
allowed to accumulate in the area of the catwalk on which he was working.  Asserting that he was a business invitee at
the time of the accident, Boutte alleged Grey Wolf failed to exercise ordinary
care to keep the rig in a reasonably safe condition by failing to remove the
mud in a reasonably prudent manner. 
After finding Grey Wolf negligent, the jury awarded Boutte $220,500 for
past damages and $212, 500 for future damages.








I. 
Legal and Factual Sufficiency Standard of Review

When reviewing the legal sufficiency of the evidence, we
consider only the evidence and inferences tending to support the jury=s findings, and disregard all
contrary evidence and inferences.  Wal-Mart
Stores, Inc. v. Canchola, 121 S.W.3d 735, 739 (Tex. 2003) (per curiam).  A no-evidence challenge will be sustained
when (1) the record discloses a complete absence of a vital fact; (2) the court
is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact
is no more than a scintilla; or (4) the evidence conclusively establishes the
opposite of the vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d
328, 334 (Tex.
1998).  A no-evidence point will be
rejected if more than a scintilla of evidence supports the finding.  Canchola, 121 S.W.3d at 739.  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v National Union Fire Ins.
Co. of Pittsburgh, Pa., 77 S.W.3d 253, 262 (Tex. 2002).

In conducting a factual sufficiency review, we must examine
the entire record, considering both the evidence in favor of, and contrary to,
the challenged finding, and set aside the finding only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per
curiam).  Because the appellate court is
not the fact finder, it may not substitute its own judgment for that of the
trier of fact, even if a different answer could be reached on the evidence.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998); Knox v. Taylor, 992 S.W.3d
40, 50 (Tex. App.CHouston [14th Dist.] 1999, no pet.).  The amount of evidence necessary to affirm
the judgment is far less than necessary to reverse a judgment.  Bracewell v. Bracewell, 20 S.W.3d 14,
23 (Tex. App.CHouston [14th Dist.] 2000, no pet.); Knox,
992 S.W.2d at 50.








II.  Duty

A landowner or one who is otherwise
in control of the premises has a duty to use reasonable care to make the
premises safe for the use of business invitees. 
Lefmark Mgmt. Co. v. Old, 946 S.W.2d 52, 53 (Tex. 1997); McIntosh v. NationsBank,
963 S.W.2d 545, 548 (Tex. App.CHouston [14th Dist.] 1997, pet. denied).  Whether a duty exists is a question of
law.  Texas Home Mgmt., Inc. v. Peavy,
89 S.W.3d 30, 33 (Tex.
2002).  The invitee must establish the
following elements to prevail on his premises liability claim: (1) the premise
owner or occupier had actual or constructive knowledge of a condition; (2) the
condition posed an unreasonable risk of harm; (3) the owner or occupier did not
exercise reasonable care to reduce or eliminate the risk; and (4) the owner or
occupier=s failure to use such care
proximately caused the plaintiff=s injury.  CMH Homes, Inc. v. Daenen, 15 S.W.3d
97, 99 (Tex.
2000).  

A. 
Objectively Obvious Condition

Grey Wolf argues that it cannot be liable under a theory of
premises liability because the evidence established that the allegedly
dangerous condition was objectively obvious as a matter of law.  The Ano duty@ doctrine provides that if there are
open and obvious dangers of which the invitee is aware, or is charged with
knowledge of, then the occupier owes the invitee Ano duty@ to warn or protect the invitee.  Parker v. Highland Park, Inc., 565
S.W.2d 512, 516 (Tex.
1978).  However, in Parker, the
Texas Supreme Court abolished the Ano duty@ doctrine.  Id.
at 517.  Instead, A[t]he reasonableness of an actor=s conduct under the circumstances
will be determined under principles of contributory negligence.@ 
Id.  








Grey Wolf acknowledges that the plaintiff=s subjective knowledge of a
dangerous condition is not relevant to the determination of the defendant=s duty, but is relevant to the
invitee=s contributory negligence.  See id.  However, Grey Wolf argues the issue here is
whether a premises owner has a duty to warn of a danger that is objectively
obvious to an average person in Boutte=s position.  In support of its assertion, Grey Wolf relies
on a products liability case.  See
Sauder Custom Fabrication, Inc. v. Boyd, 967 S.W.2d 349 (Tex. 1998) (per curiam).  In Sauder Custom Fabrication, the
Texas Supreme Court held a manufacturer or distributor does not have a duty to
warn of risks that are objectively obvious from the perspective of the average
user of the product.  Id. at 351.  Grey Wolf argues that the Supreme Court=s language in Coastal Marine
Service of Texas, Inc. v. Lawrence suggests the same rule applies in
premise defects cases.  988 S.W.2d 223 (Tex. 1999) (per curiam).


In Lawrence,
the Supreme Court set forth two categories under the premises defect theory of
liability:  (1) defects existing on the
premises when the independent contractor/invitee entered the premises, and (2)
defects created by the independent contractor=s work activity.  Id.
at 225.  With respect to defects existing
on the premises when the independent contractor/invitee enters, Lawrence
provides that the premises owner has a duty to inspect the premises and warn
the independent contractor/invitee of dangerous conditions that are Anot open and obvious@ and that the owner knows or should
have known exist.  Id. (emphasis added).  

We find Lawrence
is not applicable to this case because Boutte and his expert, Edward Ziegler,
testified that the catwalk was not unreasonably dangerous when Halliburton
entered the premises.  Moreover, there is
no indication in Lawrence,
that the court intended that the determination of whether a condition is Aopen and obvious@ be considered objectively.  We decline to extend Sauder Custom
Fabrication to this premises liability claim.  This issue is overruled.  

B. 
Creation of a Dangerous Condition








Boutte claims Grey Wolf created a dangerous condition on the
catwalk by permitting oil-based drilling mud to drip and accumulate on the
catwalk and by then failing to remove the accumulated mud from the catwalk;
thus, having created the unsafe condition, Grey Wolf had a duty to remedy that
condition and make the catwalk safe.[9]  Grey Wolf, on the other hand, contends the
source of the drilling mud was due to Halliburton=s activities, i.e., inserting,
removing, dismantling, and shaking the tool over the catwalk.

Generally, a person who does not own, occupy, or otherwise control
the premises cannot be held liable for dangerous conditions.  City of Denton
v. Page, 701 S.W.2d 831, 835 (Tex.
1986).  One who creates a dangerous
condition, even though not in control of the premises when the injury occurs,
owes a duty of care.  Lefmark Mgmt.
Co., 946 S.W.2d at 54; Science Spectrum, Inc. v. Martinez,
941 S.W.2d 910, 912 (Tex.
1997).  

Here, no question regarding the source of the dangerous
condition, i.e., whether Grey Wolf or Halliburton created a dangerous condition,
was submitted to the jury; thus, there is no finding on this element.  Pursuant to Rule 279 of the Texas Rules of
Civil Procedure, when the jury awards damages based on a charge that omits an
element necessary to sustain a ground for recovery, the trial court can file a
written finding on the missing element or render judgment without a
finding.  Tex. R. Civ. P. 279; State Farm Life Ins. Co. v. Beaston,
907 S.W.2d 430, 437 (Tex.
1995).  If the trial court does not file
a written finding, the omitted element is deemed found in support of the
missing element if there was no objection and there is factually sufficient
evidence to support such a finding.  Tex. R. Civ. P. 279; Beaston, 907
S.W.2d at 437.  Here, the trial court did
not make a written finding.  Because Grey
Wolf did not object to the omission of the element of creation of a dangerous
condition, it will be deemed found in support of the jury=s finding on premises defect if the
evidence is factually sufficient to support the finding.  








Boutte asserts the source of the mud on the catwalk was mud
dripping from drilling pipe stacked above the catwalk by Grey Wolf.  Prior to the Halliburton crew commencing its
work on January 10, 1998, Grey Wolf had swabbed the hole by inserting drilling
pipe into the hole and then removing the pipe from the hole.  After removing the drilling pipe from the
hole, Grey Wolf stacked the pipe in front of the V-door above the catwalk.  Boutte testified that as the Grey Wolf
employees were pulling the pipe out the hole, they made no attempt to clean the
pipe as it came out.  Boutte testified
that mud from the dirty pipe stacked in front of the V-door dripped on to the
catwalk. 

Contrary
to Boutte=s assertions, Grey Wolf asserts the
evidence shows the source of the dangerous condition alleged by Boutte was
actually Halliburton=s own activities.  Grey
Wolf points out that both Boutte and his expert, Edward Ziegler, testified that
no dangerous condition existed on the catwalk when Halliburton entered the
premises and began working.  On January
10, 1998, when Halliburton ran its tool down the well hole, it was unable to
get a reading and had to pull the tool out of the hole.  Halliburton then ran its tool down the well
hole again.  Nevertheless, Halliburton
still was unable to get a reading, pulled the tool out of the hole, and laid it
on the catwalk.  Grey Wolf contends that
oily mud came out of the hole each time Halliburton pulled the tool out.  Boutte, however, testified that each time the
Halliburton crew pulled the tool out of the hole, there was Aair blowing on the cable . . . [to]
blow the oil off as it=s coming out.@  Additionally, Boutte
used Aabsorption rags@ to wipe off the oil on to the top of
the hole so that he did not Ahave a mess everywhere.@ 
Grey Wolf points that despite Boutte=s best efforts, some oil came out of
the hole:

Q.  Of course
evidently some mud does come out a little bit?

A.  Yeah, I can=t stop it all.  But I can keep it to a minimum.

Ziegler further admitted that when the tool was pulled out of the hole, A[i]t=s going to have some mud, yes.@ 


When asked about whether mud dripped from the tool on to the
catwalk, Boutte explained that mud was coming off the mechanical end of the
toolCthe far end from the electronic end
of the tool where Boutte was working. 
According to Boutte, no mud came off the electronic end of the
tool.  








There
is some evidence in the record that mud came from Grey Wolf=s stacked drill pipe and from
Halliburton=s tool.  As shown by Boutte=s testimony:  

The whole catwalk -- the longer we
start breaking tools there is more and more [mud] coming all over the catwalk,
plus not counting what=s coming off the drill pipe sitting in the derrick for hours,
I mean, you know.

Grey Wolf argues that although Boutte claimed to see mud
dripping from Grey Wolf=s drill pipe onto the catwalk, there is no evidence that he
slipped in that mud as opposed to the mud from Halliburton=s tools.  When questioned during trial about what
percentage of the mud that had accumulated on the catwalk came from the
drilling pipe versus what percentage came from Halliburton=s tool, Ziegler testified that he
could not give a percentage amount for either source, but stated that mud came
from both sources.  

Boutte testified that mud continued to creep down the catwalk
towards where he was working.  Grey Wolf
points out that when Boutte came down to the catwalk to help break down
Halliburton=s tools, the drilling pipe had been
out of the well Afor hours.@  Ziegler testified
that temperature effects how slippery drilling mud is.  The outside air temperature at the time of
Boutte=s accident was apparently cold; it
was January and Boutte testified he was wearing insulated overalls with warm
material underneath.  Ziegler explained
that oil-based mud becomes cold like the outside air to which it is
exposed.  Oil-based mud exposed to cold
air Atend[s] to be more tacky and sticky
rather than slippery.@  The temperature in
the well increases as it becomes deeper; therefore, mud coming directly from
the well, i.e., from the tool just pulled out of the hole, is going to
be warmer, making it more slippery. 
Therefore, according to Grey Wolf, the mud dripping from Halliburton=s tools directly onto the catwalk was
more likely to create a slippery condition than mud on drilling pipes that had
allegedly been sitting out of the well in early January Afor hours.@ 









While Grey Wolf=s logic is persuasive, we are not the
factfinder.  Considering the evidence both
in support of and contrary to the finding, we cannot say a finding that the
source of the mud was the drilling pipe stacked by Grey Wolf is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust.  Thus, because there is some evidence of it
having created a dangerous condition, we hold Grey Wolf had a duty to remedy
the situation if it had knowledge of the dangerous condition.  

III. 
Knowledge of Unreasonably Dangerous Condition

Grey Wolf contends Boutte did not present legally and
factually sufficient evidence that it knew or should have known either mud had
accumulated on the catwalk or that the presence of mud posed an unreasonably
dangerous condition.  

To prevail on a claim for premises liability, the plaintiff
must prove the premises owner/occupier had actual or constructive knowledge of
the dangerous condition.  Wal-Mart
Stores, Inc. v. Reece, 81 S.W.3d 812, 814 (Tex. 2002). 
Actual knowledge is direct knowledge of what a person actually
knows.  Black=s Law
Dictionary 876 (7th ed.
1999).  Constructive knowledge can be
established by demonstrating the condition had existed long enough for the
owner/occupier to have discovered it upon reasonable inspection.  CMH Homes, Inc., 15 S.W.3d at 102B03. 
Although the fact that the owner/occupier of a premises created a
condition that posed an unreasonable risk of harm may support an inference of
knowledge, the jury still must find that the owner/occupier knew or should have
known of the condition.  Keetch v.
Kroger Co., 845 S.W.2d 262, 265 (Tex.
1992).  

Although Boutte testified he saw mud on the catwalk near the
V-door ramp and that mud was Acreeping@ down the catwalk, Grey Wolf contends Boutte presented no
evidence that any Grey Wolf employee saw mud on the catwalk or that anyone from
Halliburton ever brought the presence of the mud to Grey Wolf=s attention.  Instead, when Boutte and the Halliburton crew
arrived at the rig, the catwalk was Arelatively dry@ and Boutte had no complaints about
the condition of the catwalk.  Ziegler
explained that the condition of the catwalk changed over a period of time.  However, Grey Wolf employees were not allowed
on the catwalk while Halliburton was logging the well.  








Grey Wolf further argues that even if mud were dripping from
the stacked drill pipe onto the catwalk, Boutte presented no evidence as to how
long this mud had created a dangerous condition.  Grey Wolf contends that Boutte must show it
is more likely than not that the condition existed long enough to give Grey
Wolf a reasonable opportunity to discover it. 
See Reece, 81 S.W.3d at 814. 
The Atime-notice rule@ is based on the notion that temporal
evidence best indicates whether the owner/occupier had a reasonable opportunity
to discover and remedy a dangerous condition. 
Id.
at 816.  AWithout some temporal evidence, there
is no basis upon which the factfinder can reasonably assess the opportunity the
premises owner had to discover the dangerous condition.@ 
Id.  What constitutes a reasonable time for a
premises owner to discover a dangerous condition necessarily depends on the
facts and circumstances of the case; the proximity of a defendant=s employee to the condition may be
relevant to the analysis.  Id.  The supreme court emphasized that before
liability can be imposed on the premises owner/occupier for failing to discover
and rectify, or warn of, the dangerous condition, there must be some evidence
of how long the hazard was there.  Id.  Otherwise, owners/occupiers would face strict
liability for any dangerous condition on their premises, an approach the
supreme court has Aclearly rejected.@ 
Id.  

Grey Wolf contends that Boutte=s testimony that this mud was a Acouple of feet away@ from where he was working when he
first came down from the rig floor to the catwalk and Ziegler=s testimony that the catwalk became
dangerous at some unknown point while Halliburton was working is no evidence
that the dangerous condition had existed for a long enough time for Grey Wolf
to have had an opportunity to discover it. 









As noted by Grey Wolf, when Boutte first started working on
the catwalk, the mud on the catwalk was a couple feet away from where Boutte
was standing.  Ziegler testified that
Boutte was on the catwalk for one to three hours, while Boutte testified that
he was on the catwalk for more than an hour trying to help break down the tools
when he fell.  Boutte explained that mud
had been dripping from the stacked drill pipe Afor hours@ and was Acreeping down the catwalk@ while he was working on the
tool.  Boutte further testified that
while he was on the catwalk, Grey Wolf employees were watching him and
hollering at the Halliburton crew to finish its job.  While there is no testimony in the record as
to precisely how high the rig floor was above the catwalk, Ziegler testified
that the typical rig floor is between ten to thirty-two feet above the
ground.  He also testified that the
catwalk is normally three or four feet above the ground.  Thus, Boutte contends the jury could infer
that the Grey Wolf employees, who were watching him from a rig floor that was
as little as six feet and no more than twenty-nine feet above the catwalk,
could see the muddy condition of the catwalk. 
Finally, Ziegler testified that Grey Wolf would know Aall the different sources of oil
based mud getting the catwalk.@  

The testimony showed that Boutte was on the catwalk for at
least an hour prior to his fall and that mud was present on the catwalk for the
entire time he was working on the catwalk. 
Grey Wolf, however, also contends Boutte cannot establish that it had a
reasonable opportunity to discover the existence of a dangerous condition that
developed while Halliburton was working on the catwalk because, as Grey Wolf
points out, no Grey Wolf employees were on the catwalk while Halliburton was
logging the well.  It is undisputed,
however, that Grey Wolf=s employees were watching Boutte as he worked and Ahollering@ at the Halliburton crew to finish
logging the well because they were anxious to get the pipe back in the well
before it collapsed.  Thus, we find the
jury could infer that the Grey Wolf employees could see there was mud on the
catwalk.  

Grey
Wolf asserts the evidence is legally and factually insufficient to support a
finding that Grey Wolf should have known the catwalk was unreasonably
dangerous.  Boutte and Ziegler testified
that workers in Boutte=s position often work in mud. 
Until he fell, Boutte did not think the catwalk was too slippery for him
to work safely.  Boutte, on the other
hand, contends Grey Wolf knew the presence of oil-based drilling mud on the
catwalk was a dangerous condition.  For
example, Grey Wolf=s safety manual identifies drilling mud as a Aslipping hazard@ or Ahazard@: 









$          Floormen
should wash down each stand of a pulled drill pipe with a water hose to prevent
excess build up of mud on the rig floor and pipe rack, unless oil-base[d] mud
is used.  Drilling mud will become a
slipping hazard.

$          As
drilling mud drains out of the racked stands of drill pipe, the mud should be
hosed or squeegeed off the pipe rack to eliminate a slipping hazard.

$          In
most cases drilling mud will splash out when a connection has been made,
causing slippery condition.  The floor should
be washed down as quickly as possible to eliminate this hazard.

Grey Wolf complains that statements in its safety manual to
the effect that it knew that drilling mud can be a hazard is not evidence that
it actually knew there was mud on the catwalk.  We agree with this particular contention.  See Big Bend Flying Serv., Inc. v. Hinojos,
489 S.W.2d 694, 696 (Tex. Civ. App.CEl Paso 1973, no writ) (stating Aknowledge that a given condition is
dangerous is vastly different from knowledge that a dangerous condition
actually exists.@).  However, Boutte has
presented some evidence that Grey Wolf knew mud was on the catwalk and
the safety manual shows Grey Wolf knew the accumulation of oil-based mud can
create an unreasonably dangerous condition. 


We conclude the evidence is legally and factually sufficient
to support a finding that Grey Wolf had either actual or constructive knowledge
that mud had accumulated on the catwalk, that Grey Wolf had a reasonable
opportunity to discover the presence of the mud, and that Grey Wolf knew the
accumulation of oil-based drilling mud could create a dangerous condition.  Accordingly, we overrule this issue.  

IV. 
Proximate Cause of Boutte=s Fall








Grey
Wolf contends the evidence is legally and factually insufficient to establish
that Boutte=s fall was caused by the dangerous
condition, i.e., the build-up of Aheavy mud@ on the catwalk.  Grey Wolf claims Boutte presented no evidence
that he fell as a result of any mud on the sidewalk, but, instead, testified
during cross-examination that he does not know what caused him to fall: 

Q.  How did you
fall?

A.  Well, as I was shaking the tool C 
I don=t even know how.  Just my leg went one way and the other leg went
like it tried to go that way.  And I just
went straight down, you know.

Grey Wolf also
cites to testimony on direct examination in which Boutte speculates that he
slipped on the Aindentures@ in the surface of the catwalk:

Q.  Was it what
you just described it was, a film of mud on the catwalk, where you were working
when you slipped?

A.  And had
these little indentures at that point where pipe would come down and hit that,
you know, these little C it wasn=t a flat
surface.  Like they had like little ruts
in it.

Q.  You=re not testifying that you slipped in the indentures;
are you?

A.  I don=t know what.  I just slip. 
I just know I slipped on the catwalk. 
As far as the exact spot I was standing, I couldn=t tell you if they have an indenture
an inch away from me.  My foot got in one
of them.  I can=t say, you know.

However, Boutte
also testified that he slipped in the mud: 


Q.  When you=re shaking the tool and you slip, what did you slip
on?

A.  I slipped
on, I guess, the oil surface that was there. 
There was nothing else.  There was
nothing underneath my feet other than the catwalk.

Q.  There was
mud underneath your feet?  That=s the allegation in this case; right?

A.  There was
mud, those little indentures, there was the catwalk.

Q.  Are you saying
you slipped in the indentures?








A. 
I=m not saying that.  I=m saying that there was mud.  The catwalk wasn=t a smooth surface like this.  They had like little indentures in all
spots.  I just knew I slipped where they had
indentures around me.  They had mud
underneath, you know.  And when I fell in
the mud, because I got covered all in my back. 
I could feel it.  I could see I
had mud all over me.

Moreover, Grey Wolf employee Daniel Guidry testified that at
a safety meeting the morning following Boutte=s accident, the tool pusher announced
that a Halliburton employee had slipped in oil-based mud on the catwalk.  Dr. John Cobb testified that Boutte told him
that he was injured when he slipped in oil-based mud while he was working.  

While Boutte=s testimony is at times imprecise, conflicting, and difficult
to understand, it is the province of the jury to resolve conflicts in the
evidence.  Examining the record before
us, we cannot say the evidence is legally and factually insufficient to support
a finding that the proximate cause of Boutte=s fall was the presence of oil-based
mud on the catwalk.  Accordingly, this
issue is overruled.  

V. 
Contributory Negligence

Grey Wolf claims the jury=s finding that Boutte was not negligent
is against the great weight and preponderance of the evidence.  Because Grey Wolf challenges the factual
sufficiency of an adverse finding on which it had the burden of proof, it must
demonstrate on appeal that the adverse finding is against the great weight and
preponderance of the evidence.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).  In reviewing a complaint that the jury=s finding is against the great weight
and preponderance of the evidence, we must examine the entire record to
determine if there is some evidence to support the finding.  Oadra v. Stegall, 871 S.W.2d 882, 892
(Tex. App.CHouston [14th Dist.] 1994, no
writ).  Only if the finding is so
contrary to the overwhelming weight and preponderance of the evidence as to be
clearly wrong and manifestly unjust, must we sustain the challenge.  Id.  Because the appellate court is not the
factfinder, it may not substitute its own judgment for that of the jury, even
if a different answer could be reached on the evidence.  Knox, 992 S.W.2d at 50; Peter,
915 S.W.2d at 649.  








Grey Wolf points out that Boutte was aware of both the
existence of the mud on the catwalk and the risks involved in working in
oil-based drilling mud, and that Boutte and the Halliburton crew chose to Abreak down@ the tool as close to the pipe ramp
as possible to save time, even though Boutte claimed mud was accumulating
there.  

The evidence also showed there was an urgency to Halliburton
trying to finish its job.  Ziegler
testified that when the pipe is removed from the well, the well is Aidle@ and there is a risk that either the
well will start deteriorating and subsequently collapse or start flowing.  It was essential that Halliburton complete
its work without delay so the pipe could be inserted back into the well.  Boutte similarly testified that when they are
working, they are aware that the well can collapse or that a Ablow out@ can occur when the pipe is out of
the well.  Boutte testified that while he
was working on the catwalk, Grey Wolf employees were hollering at him to hurry
because they were Agoing to lose our well.@ 

Ziegler testified that working in the mud is sometimes Aan unavoidable situation.@ 
Boutte also testified that working in mud is often part of the job.  Boutte testified that he Atried [his] best@ to work safely on the muddy
catwalk.  For example, prior to starting
his work on the catwalk, Boutte used rags to wipe up the mud that was on the
catwalk.  Boutte also used air to blow
mud off the cable and rags to wipe mud off the tool as it was pulled out of the
well in order to leave as much mud in the hole as possible.  Boutte also wore rubber boots with treads,
which is appropriate for working in oil-based drilling mud.  Boutte explained that if his supervisor
thinks it is safe enough to work, the crew continues to work in those
conditions.  In Ziegler=s opinion, Boutte acted as a
reasonably prudent logging hand wire operator should under the same or similar
circumstances, working as safely under the circumstances.  

While there is much evidence in the record before us that
Boutte=s negligence contributed to the
accident, we find the jury=s conclusion that Boutte was not contributorily negligent is
not so against the great weight and preponderance of the evidence so as to be
clearly wrong and manifestly unjust. 
Accordingly, this issue is overruled. 









VI. 
Damage Award

The jury awarded Boutte $220,500 for past damages and
$212,500 for future damages.  Damages
included physical pain and mental anguish, loss of earning capacity, physical
impairment, and medical care.  Boutte=s economic expert testified that
Boutte=s total lost earning capacity was
$406,441.  Grey Wolf asserts the $433,000
damage award is excessive because although Boutte alleges that he sustained
injury to both his back and knee as a result of his January 10, 1998 fall, that
amount was largely based on evidence related to his back injury and his
inability to work at Halliburton because of his back injury.  Grey Wolf contends neither Boutte=s physician=s testimony nor Boutte= testimony is sufficient to establish
causation with respect to his back injury. 
Therefore, in the absence of evidence of causation regarding Boutte=s back injury, Grey Wolf argues
evidence of damages attributable to Boutte=s knee injury is factually
insufficient to support the damages award.[10]


About twelve hours after the accident, Boutte was taken to a
hospital in Fort Bend County
where he was Achecked out.@ 
Boutte went home to New Iberia,
 Louisiana on crutches.  Halliburton then sent Boutte to a doctor in New Iberia, who, in turn,
referred him to Dr. William Cenac, an orthopedic surgeon.  In February 1998, Dr. Cenac performed
arthroscopic surgery on Boutte=s right knee. 
Afterwards, Boutte received therapy for his knee.  In April 1998, Boutte returned to light duty
work.  

Boutte testified he informed Dr. Cenac in March 1998, that he
was experiencing back pain, but Dr. Cenac told him he would have to present his
back problem to the Halliburton physician. 
Boutte=s medical records from his family
physician, Dr. G.D. Sagrera, show that Boutte complained of back pain on June
12, 1998.  








On July 7, 1998, Dr. Cenac released Boutte to Aregular duty status.@ 
On July 8, 1998, Boutte went to the Medworks Clinic in New Iberia complaining of lower back
pain.  According to Medworks= records, since returning to light
duty work, Boutte had developed some lower back pain and Dr. Cenac had referred
him back to the clinic Afor evaluation and possible treatment of the lumbar pain.@ 
Medworks recommended further follow up by an orthopedic specialist for
continued knee pain and Ibuprofen and stretching exercises for his back
pain.  

Boutte first saw Dr. John E. Cobb, who is board certified in
both orthopedic surgery and spine surgery, in December 1998, for his back
pain.  At that time, Boutte told Dr. Cobb
that he had slipped in oil-based mud while working on the catwalk of an oil
rig.  On December 17, 1998, Dr. Cobb
prescribed Boutte pain medication.  In
February 1999, Dr. Cobb performed an MRI, which revealed abnormalities in the
two lower discs in Boutte=s back.  Dr. Cobb
recommended a surgical procedure on his back, but Boutte declined to undergo
the procedure.  

Dr. Cobb last saw Boutte on March 22, 2000.  At that time, Dr. Cobb believed Boutte should
seek less physically demanding workCsomewhere between light and medium
level work, Awhich would imply that he would put
about a 50 pound lifting restriction on his back if he does any lifting
occasionally.@ 


Dr. Cobb stated that he does not know exactly when Boutte=s back pain started, i.e.,
whether it started at the time of the accident or whether it started later on,
and he did not specifically ask, but Boutte indicated to him that he had
suffered back pain all along, and as he became more active, his back became
worse, which is the reason Boutte came to see him.  Dr. Cobb explained that Boutte=s not complaining of back pain
(annular tear) for four or five months after the accident is Asomewhat surprising, but not terribly
unusual. . . . [I]t=s not the typical situation, I don=t think.@ 









Dr. Cobb originally opined that based upon reasonable medical
probability, Boutte=s January 10, 1998 fall caused his back injury.  Dr. Cobb explained that this is the type of
injury that is likely to cause physical pain in the future and Boutte will
probably experience some chronic pain. 
Dr. Cobb further stated that Boutte=s back injury could significantly
impair his ability to use his back, i.e., lifting, bending, and
twisting.  Dr. Cobb concluded that Boutte
could not return to work as a wireline operator, but that he could do light to
medium type work.  

Grey Wolf complains Dr. Cobb=s testimony is factually and legally
insufficient to support causation.  While
Dr. Cobb initially based his opinion that the January 10, 1998 fall caused
Boutte=s back injury upon reasonable medical
probability, he came to that conclusion without any knowledge that Boutte had
suffered from back and neck pain from injuries sustained in an automobile
accident in 1993, or that Boutte had fallen down some stairs at work in
1981.  Boutte did not inform Dr. Cobb
that he had experienced any prior problems with his back, neck, or knee.  

AReasonable medical probability@ concerns the showing that must be
made to support an ultimate finding of fact, not the standard by the which the
medical expert must testify.  Lenger
v. Physician=s Gen. Hosp., Inc., 455 S.W.2d 703, 707 (Tex.
1970).  The plaintiff is not required to
establish causation in terms of medical certainty; nor is he required to
exclude every other reasonable hypotheses. 
Bradley v. Rogers, 879 S.W.2d 947, 954 (Tex. App.CHouston [14th Dist.] 1994, writ
denied).  While expert testimony
concerning the possible causes of the condition in question is admissible to
assist the trier of fact in evaluating other evidence in the case, a possible
cause only becomes probable when, in the absence of other reasonable causal
explanations, it becomes more likely than not that the injury was a result of
its action.  Parker v. Employer Mut.
Liability Ins. Co., 440 S.W.2d 43, 47 (Tex. 1969). 
It is Anot absolutely necessary@ for the expert to couch his opinion
in terms of Areasonable medical probability.@ 
Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). 









With
respect to knowledge of those prior accidents, Dr. Cobb testified AI don=t know if it would have had any
bearing on C on my feeling in terms of causation.@ 
Dr. Cobb admitted that Boutte could have had back pain prior to January
10, 1998, and that it is possible Boutte=s back pain could have started at the
time of the automobile accident in 1993. 
However, Dr. Cobb testified that if Boutte had been experiencing pain in
his back to this extent, it probably would have affected his Afunctional capacity,@ and he probably would have sought
medical attention.  Dr. Cobb testified: 

Q.  So . . .
knowing all of the complete picture, can you still say that C with a reasonable degree of medical probability that
this particular lower back injury was caused specifically by that accident of
January 10, 1998?

A.  Well, as I
mentioned, in terms of what you provided me about some of the events that may
have occurred prior to this, there=s no
indication that he had chronic pain from that. 
If we assume that he had an automobile accident which led to these
injuries and he had chronic pain, then that would be something else.  If I don=t have
that history C I mean, I=m kind
of relying on the history.

What you=ve
indicated to me is not enough information for me to tell you that this more
probably came from this automobile accident, you know.  I mean, certainly, automobile accidents can
cause disk related injuries.  I don=t have that C enough
information to say that it=s more probable that that accident caused it than the
one we=re talking about here. 
I mean, I=m relying on him telling me about the onset of it, and
what I gathered from him, he C he indicated to me that his knee and his back hurt
along [sic], but his back got worse.  So,
apparently, it wasn=t as bad initially as it was when he first came to see
me, but I don=t have enough information to tell you that there=s something else that caused it, really.

Q.  But you don=t have enough information from C from when you started seeing him to be able to ruled
[sic] those out, correct, if you=re just
finding out about those right now?

A.  Well, I=d have C again, I=d have to look C I=d have to look at more history, if
there=s more available, to support that as
being the cause of his back as opposed to this right here.








After being told that Boutte had been involved in other
accidents, Dr. Cobb testified that Aautomobile accidents can cause disk
related injuries.  I don=t have . . . enough information to
say that it=s more probable that that
[automobile] accident caused it than the one we=re talking about here.@ 
While Dr. Cobb was not required to exclude all other reasonable
hypotheses, he was not able to say, without more information on Boutte= medical history, that it was more
probable that one event or the other, i.e., the fall on the catwalk or
the automobile accident, caused Boutte=s back injury.  Therefore, Dr. Cobb=s testimony is not legally or
factually sufficient to support finding that Boutte=s January 10, 1998 fall caused his back
injury. 

Grey Wolf similarly complains that Boutte=s testimony is also not legally or
factually sufficient to support a finding that his fall on the catwalk caused
his back injury.  Grey Wolf points out
that the first written complaint of Boutte=s back pain appears in June 12, 1998
medical records from Dr. Sagrera=s officeCfive months after his fall.  Grey Wolf, thus, argues the gap in time
between the accident and the reporting of the back pain does not provide Aa strong, logically traceable connection
between cause and result@ and, therefore, is too speculative to support a finding of
proximate cause between his fall and his back injury.  See Griffin
v. Texas Employers= Ins. Ass=n, 450 S.W.2d 59, 61 (Tex. 1969). 


Lay testimony is sufficient to establish causation in those
cases in which general experience and common sense will enable a layman to
determine, with reasonable probability, the causal relationship between the
event and the condition.  Morgan v.
Compugraphic Corp., 675 S.W.2d 729, 733 (Tex. 1984); Lenger, 455 S.W.2d at
706.  Lay testimony that establishes a
sequence of events providing a Astrong, logically traceable connection between the event and
the condition is sufficient proof of causation.@ 
Morgan, 675 S.W.2d at 733; see also Griffin, 450 S.W.2d at
61 (AIf proof only shows that one event
followed another with a long period of time in between, it is at least as
reasonable to conclude that the events are coincidentally related as causally
related.@). 


Boutte testified that he experienced stiffness in his back
after his fall.  After he was no longer
taking pain medication, he noticed that the stiffness in his back had not
subsided.  Boutte testified that he reported
his back pain in March 1998, to Dr. Cenac, who referred him back to the
Halliburton doctor.  








Prior to starting work for Halliburton, Boutte also took a APre-Work Screen@ (physical examination) in January
1996, which shows that Boutte was able to meet the various categories of
physical movement, including lifting, front carry, repetitive squats, overhead
work, pushing, pulling, climbing, sustained crouching, balancing, hoisting, and
grip strength.  The critical demands
required that Boutte be able to lift 100 pounds 48 inches off the floor and to
front carry 150 poundsCrequirements that Boutte satisfied.  The pre-work screen stated that Boutte=s A[p]hysical abilities do match the
functional requirements of the Logging job description.@ 
Boutte testified he was no longer able to meet the requirements of this test.


Boutte testified that he experiences stiffness in his back
and is uncomfortable if he sits too long a period of time.  He also experiences a sharp pain if he bends
over too fast.  Boutte stated he cannot
return to Halliburton because he is unable to lift more than 50 pounds.  Prior to his accident, Boutte was able to
lift one end of the logging tool weighing 500 pounds.  If Boutte had been having problems with his
back prior to his fall, he would not have been able to lift the tool or perform
any of the other heavy lifting required for his job.  We find Boutte=s testimony provides a Astrong, logically traceable
connection between@ the January 10, 1998 fall and Boutte=s back injury and, therefore, is
legally and factually sufficient to establish the causal relationship.  

Boutte=s economic expert, Dr. Kenneth McCoin, was asked to determine
Boutte=s loss of earning capacity.  McCoin=s testimony demonstrates that Boutte=s total lost earning capacity is
$406,441, based on Boutte=s inability to work as a wireline operator after the
accident, but instead having to work a job after the accident that pays
less.  Additional evidence showing
medical expenses of over $29,000 was presented at trial.  Finally, Boutte testified as to his physical
pain and physical impairment.  We find
the evidence is factually sufficient to support the award of damages.  Accordingly, this issue is overruled.








VII.  Jury Argument

Although Boutte claims that his back
injury was caused by his fall on January 10, 1998, the first written complaint
of any back problem is found in the records of Dr. Sagrera=s on June 12, 1998Ca few days after Boutte had retained
an attorney to represent him in his claims against Grey Wolf on June 8, 1998.  Grey Wolf=s trial counsel attempted to point
out to the jury that Boutte=s first recorded complaint of back pain came only a few days
after he had retained an attorney.  Grey
Wolf claims the trial court erred in refusing to allow its trial counsel to argue
that the jury could draw an inference that Boutte=s fall was not the cause of his back
injury.  








Control over counsel=s argument to the jury is within the
sound discretion of the trial court.  National
Union Fire Ins. Co. of Pittsburgh, Pa. v. Soto, 819 S.W.2d 619, 624 (Tex.
App.CEl Paso 1991, writ denied).  It is proper for counsel to argue reasonable
inferences from the evidence.  Gorman
v. Life Ins. Co. of N. Am., 859 S.W.2d 382, 389 (Tex. App.CHouston [1st Dist.] 1993, no
writ).  It may well have been reasonable
to infer that because there was no written record of any back pain until four
days after Boutte had seen a lawyer that his back injury was not caused by his
fall on the catwalk.  However, if the
trial court erred in excluding the evidence, we find it to be harmless.  The jury heard conflicting evidence regarding
when Boutte first experienced back pain. 
Boutte=s testimony was that he began
experiencing back pain almost immediately after the fall; however, his first
written complaint regarding back pain was five months after the fall and
shortly after he retained an attorney. 
Greywolf=s counsel was permitted to forcefully argue that Boutte=s back pain was either fraudulent or
unrelated to the fall.[11]  Finding the trial court=s action probably did not cause the
rendition of an improper judgment, we find the error, if any, was
harmless.  Accordingly, this issue is
overruled.  

VIII.  Dismissal of Jurors for
Cause

Grey Wolf asserts the trial court abused
its discretion by erroneously dismissing several jurors for cause, resulting in
an unequal apportionment of peremptory challenges.  Grey Wolf complains that Boutte=s counsel asked questions of the
venire panel during voir dire that were designed to ask panel members whether
they would consider particular facts that were to be introduced into evidence
as conclusive to their determination of whether Boutte or Grey Wolf was
negligent.  








Voir dire examination falls within the sound discretion of
the trial court.  Babcock v. Northwest
Mem=l Hosp., 767 S.W.2d 705, 709 (Tex. 1989).  A party should be allowed broad latitude
during voir dire examination so as to enable the party to discover any bias or
prejudice by potential jurors and intelligently exercise peremptory
challenges.  Id. 
However, a question that attempts to commit a potential juror to a
particular outcome or a determination of the weight given the evidence is
improper.  Vasquez v. Hyundai Motor
Co., 119 S.W.3d 848, 855 (Tex.
App.CSan Antonio 2003, pet. granted) (en
banc); Lassiter v. Bouche, 41 S.W.2d 88, 90 (Tex. Civ. App.CDallas 1931, writ ref=d). 


During
voir dire, Boutte=s counsel asked the panel the following questions:

Is there anybody here who would say, well, Mr. Boutte
knew the mud was slippery and he continued to work instead of stopping work and
risking a kick, as you call it, or a well hole collapsing.  Anybody not going to listen to all the
evidence and focus only on the fact that Mr. Boutte was experienced and he knew
it was slippery?

                                                                   *        *       
*

Anyone here agree with Mrs. Romanov
that no matter what=s going on out there, if Mr. Boutte knew the drilling mud was
slippery when he was working there, that=s the end of the case?  Anybody feel that way?

At
this point, Grey Wolf=s trial counsel asked if they could approach the bench, and a
discussion took place at the bench off the record.  Following the discussion at the bench, Boutte=s counsel asked the following:

Let me ask it a different way.  Is there anyone here who given undisputed
evidence C I=m telling you it will be undisputed
that the drilling mud was slippery. 
Denfer Boutte knew he was working in slippery drilling mud and he
continued to try to finish the Halliburton job. 
Anyone given those undisputed facts could not consider the rest of the
evidence that will be presented to you regarding the urgency of the situation
he was in?








Boutte challenged several potential jurors for cause based on
those jurors= responses to the above questions.  Grey Wolf objected to those challenges.  The trial court granted Boutte=s challenges for cause on five
potential jurors.  Grey Wolf complains
that each instance of bias was entirely the result of the improper commitment
question.  

Although Grey Wolf objected at the time Boutte challenged the
jurors for cause, it did not object at the time Boutte=s attorney asked the voir dire panel
the complained of questions.  Even if we
consider Grey Wolfe=s objection timely, we find the question finally put to the
jurors was not an improper Acommitment@ question because it did not ask jurors to commit to a
particular verdict or the weight they would give particular evidence, i.e.,
Boutte=s knowledge that he was working
oil-based drilling mud and that such mud is slippery, but, instead, only sought
to discover any prejudice or bias on the part of the potential jurors, i.e.,
whether potential jurors would Alisten to all the evidence@ and Aconsider the rest of the evidence@ before making a decision.  Accordingly, this issue is overruled.  

While many of the aforementioned issues have arguable merit,
we are obliged to yield to factual findings of the jury where the evidence is
legally and factually sufficient even if the evidence would support a contrary
finding.  Moreover, we must also yield to
discretionary rulings of the trial court where the lower court has not abused
its discretion even if we might have ruled differently.  The judgment of the trial court is
affirmed.  

 

 

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

 

 

Judgment rendered
and Memorandum Opinion/Opinion filed December 14, 2004.

Panel consists of
Justices Yates, Anderson, and Hudson.











[1]  A Ablowout@ is Aan uncontrolled flow of gas, oil, or other well fluids
from the well.@  U.S.
Department of Labor: Occupational Safety & Health Administration, Oil and Gas Well Drilling and Servicing eTool:
Glossary of Terms (November 11, 2004) <
http://www.osha.gov/SLTC/etools/
oilandgas/glossary_of_terms/glossary_of_terms_a.html >.

AWell control@ means Athe methods used to control a kick and prevent a well
from blowing out.  Such techniques
include, but are not limited to, keeping the borehole completely filled with
drilling mud of the proper weight or density during operations, exercising
reasonable care when tripping pipe out of the hole to prevent swabbing, and
keeping careful track of the amount of mud put into the hole to replace the
volume of pipe removed from the hole during a trip.@  Id.

A Aborehole@ or Awellbore@ is Athe hole drilled by the bit.  A wellbore may have casing in it or it may be
open (uncased); or part of it may be cased, and part of it may be open.@  Id.





[2]  The Arig floor@ is Athe area immediately around the rotary table and
extending to each corner of the derrick or mastCthat is,
the area immediately above the substructure on which the rotary table, and so
forth rest.@  Id.





[3]  The Aderrick@ is Aa large load‑bearing structure, usually of
bolted construction. In drilling, the standard derrick has four legs standing at
the corners of the substructure and reaching to the crown block. The
substructure is an assembly of heavy beams used to elevate the derrick and
provide space to install blowout preventers, casingheads, and so forth.@ Id.





[4]  ADrill pipe@ is Athe heavy seamless tubing used to rotate the bit and
circulate the drilling fluid. Joints of pipe are generally approximately 30
feet long are coupled together by means of tool joints.@  Id.

APipe racks@ are Ahorizontal supports for tubular goods.@  Id.





[5]  The Acatwalk@ is  Athe
elevated work area adjacent to the vdoor and ramp on a drilling rig where pipe
is laid to be lifted to the derrick floor by the catline or by an air hoist.@  Id.

The Apipe
ramp@ is Aan angled ramp for dragging drill pipe, casing and
other materials up to the drilling floor or bringing such equipment down.@  Id.





[6]  The AV‑door@ is Aan opening at floor level in a side of a derrick or
mast. The V‑door is opposite the drawworks and is used as an entry to
bring in drill pipe, casing, and other tools from the pipe rack.@  Id. 





[7]  A Alog@ is Aa systematic recording of data, such as a driller=s log, mud log, electrical well log, or radioactivity
log. Many different logs are run in wells to discern various characteristics of
downhole formation.@  Id.

A logging tool or Alogging device@ may be Aany of several electrical, acoustical, mechanical, or
radioactivity devices that are used to measure and record certain
characteristics or events that occur in a well that has been or is being
drilled.@  Id.





[8]  Boutte also
sued Anschutz Exploration Corporation and Anschutz Gulf Coast Corporation.  The trial court, however, granted summary
judgment in favor of both Anschutz defendants. 






[9]  Boutte also
asserts three additional reasons Grey Wolf owed him a duty to use reasonable
care to keep the catwalk clean and safe: (1) Grey Wolf agreed in writing
to keep the catwalk clean and safe, (2) Grey Wolf had complete control over the
catwalk, and (3) Grey Wolf had the right of control over the injury-causing
condition.  In light of the disposition
of this case, we need not address these other grounds.





[10]  See
Maritime Overseas Corp., 971 S.W.2d at 406 (AThe
standard of review for an excessive damages complaint is factual sufficiency of
the evidence.@).  





[11]  Greywolf=s counsel directed a large portion of his argument to
the legitimacy of Boutte=s back injury. 
The following is but a small portion of that argument:

Let=s talk about his injuries for a minute.  Mr. Boutte falls.  What he does he falls straight down on his
knee and does some damage to his right knee that causes him to have
arthroscopic surgery.  And when he fell
down the brunt of his weight fell onto his knee and tore his knee up.  And that=s what
absorbed the weight of his body coming down onto the catwalk was his knee.  It was not his back.  This is why, folks, this stuff is
undisputed.  You=re going to have these records back in the back room
in case you need them.  If you look at
the Polly Ryon Memorial
 Hospital records when he
went there to the ER no mention of a back problem.  If you look at the records of Doctor Cenac,
who Mr. Boutte says he told virtually every time he went in there he was having
problems with his back, there is not one note in here indicating he=s got a problem with his back.  Not one. 
And, folks, he=s relying on Doctor Cenac for treatment.  These doctors are trained to write down the
treatment and the complaints made to them in their notes.  And it=s not
until he gets to the first note that I can find any of this fellow=s medical records that he=s complaining of a back problem is June of that year
to his own physician.  Then he=s going to see Doctor Cenac.  And then he goes to see Doctor Cobb.  Doctor Cobb=s
testimony is interesting in a lot of respects. 
And this is one that I want you to remember.  The annular tear on the B annular tear in Mr. Boutte=s back is on the left side of his spine.  You probably were wondering why I asked him
today when he was on the stand where does your back hurt?  And his back hurts on the right side.  And if you look at Doctor Cobb=s records consistently he is saying his back hurts on
the right side.  At the end of Doctor
Cobb=s testimony today you heard him say this is moving
around.  That he is surprised at his
reports of pain.  Because there is
nothing objective that ties in his reports of pain to the objective tests that
he=s seen.  The
reason he=s surprised that this pain is being reported on his
right side versus his left side is that the tear is on his left side.  He ought to be hurting on his left side and
he=s reporting pain on the right.